Docket No. 101251.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

JYOTI MOHANTY, M.D., *et al.*, Appellants, v. ST. JOHN HEART
CLINIC, S.C., *et al*., Appellees.

*Opinion filed December 21, 2006.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald and Kilbride concurred in the judgment and opinion.

Justice Karmeier specially concurred, with opinion, joined by Justice Garman.

Justice Freeman concurred in part and dissented in part, with opinion.

## OPINION

Dr. Jyoti Mohanty and Dr. Raghu Ramadurai (plaintiffs) appeal the judgment of the appellate court reversing the circuit court of Cook County's denial of a preliminary injunction to St. John Heart Clinic and its owner, Dr. John Monteverde (defendants), to enforce the restrictive covenants contained in their medical practice employment contracts. 358 Ill. App. 3d 902. Plaintiffs, in opposition to the injunction, ask this court to declare restrictive covenants in medical practice cases void as against public policy. In the alternative,

plaintiffs argue that the restrictive covenants contained in their employment contracts are not enforceable because the restrictions are unreasonably overbroad in time and activity, or because the defendants materially breached the employment contracts, thereby discharging plaintiffs from their obligations under the contract.

For the reasons stated below, we affirm the judgment of the appellate court and remand for further proceedings consistent with this opinion.

## BACKGROUND

St. John Heart Clinic (the Clinic) is an Illinois professional medical corporation founded by Dr. John Monteverde in 1978. Dr. Monteverde is board certified in internal medicine and cardiology and the sole shareholder and owner of the Clinic, which has two offices in Chicago, one at St. Mary of Nazareth Hospital and one at Norwegian American Hospital. Dr. Monteverde also has privileges at St. Elizabeth and Sacred Heart hospitals in Chicago and has practiced at these hospitals since 1978.

Dr. Ramadurai began working at the Clinic in 1989 as an independent contractor. At that time, Dr. Ramadurai was not board certified in cardiology. Thus, initially, Dr. Ramadurai worked under the direction and supervision of Dr. Monteverde. In 1993, Dr. Ramadurai became an employee of the Clinic. The employment contract he signed provided that he would receive an annual salary of 50% of his gross receipts.[1] In addition, the contract contained a "non-compete" clause, or restrictive covenant, which provided that, upon termination, Dr. Ramadurai "shall not" practice medicine within a two-mile radius of any Clinic office or at any of the four hospitals where the Clinic operated, *i.e.*, St. Mary of Nazareth, Norwegian American, St. Elizabeth, and Sacred Heart (the restricted hospitals), for a period of three years.

Dr. Mohanty joined the Clinic in July 2000 after he completed training in nuclear cardiology at Cook County Hospital. When Dr. Mohanty began his employment with the Clinic he was not yet board

---

[1]The contract was later amended to afford Dr. Ramadurai 55% of his gross receipts.

certified in cardiology, had no medical practice of his own and no staff privileges at any of the restricted hospitals. Pursuant to his employment contract, Dr. Mohanty received an annual salary of 50% of his gross receipts, with a guaranteed minimum of $160,000.[2] The contract also contained a restrictive covenant, similar to the one in Dr. Ramadurai's contract, which provided that, upon termination of the agreement, Dr. Mohanty "shall not" practice medicine within a five-mile radius of any Clinic office or at any of the four restricted hospitals for a period of five years.

On March 12, 2003, Drs. Mohanty and Ramadurai sent letters to Dr. Monteverde, serving him with notice of their intention to terminate their employment with the Clinic after 120 days, in accordance with their employment contracts. In their letters, Drs. Mohanty and Ramadurai stated that they were terminating their employment because Dr. Monteverde breached their employment contracts by refusing to give them partnership interests in the Clinic and because Dr. Monteverde was billing under his name for patients they saw, which caused them to be shortchanged on their bonuses.

In May 2003, prior to leaving the Clinic, Drs. Mohanty and Ramadurai filed complaints for declaratory relief in the circuit court of Cook County. In the complaints, they alleged that the restrictive covenants in their employment contracts should be declared void as against public policy and unenforceable because Monteverde breached their employment agreements by various means, including refusing to give them partnership interests in the Clinic and billing improperly which caused them to receive less compensation than they were due. Dr. Mohanty's complaint further alleged that the restrictive covenant in his employment agreement was invalid because "the duration of the restrictive covenant, that is five (5) years, and its geographical limits, that is five (5) miles, are unnecessary to protect the economic or

---

[2]Dr. Mohanty's contract was amended on October 10, 2001, to provide that his annual salary would be 50% of his gross receipts, with a guaranteed minimum of $200,000, to be paid in monthly installments of $16,666.66. If 50% of his gross receipts exceeded the $200,000 minimum, the remainder was to be paid in a lump sum "bonus." The amended contract also calculated Dr. Mohanty's "bonus" for the July 1, 2000, through June 30, 2001, fiscal year to be $65,000.

business interest of either St. John or Dr. Monteverde and therefore are excessive, unjust, unreasonable, unlawful, and unenforceable." The plaintiffs' declaratory actions were later consolidated by order of the court.

Defendants answered the complaints, denying all of plaintiffs' claims. Defendants averred that no promises had been made to either Dr. Mohanty or Dr. Ramadurai concerning a partnership interest in the Clinic. Moreover, defendants contended that, even if oral promises had been made, the failure to keep such promises would not constitute a breach of the employment contract. Defendants also denied that its billing practices were unethical, unprofessional or improper. Defendants then filed a countercomplaint for declaratory, injunctive and other relief against the plaintiffs. In addition to seeking preliminary and permanent injunctions to restrain Drs. Mohanty and Ramadurai from violating the restrictive covenants in their contracts, the countercomplaint raised claims of misappropriation and unjust enrichment and sought a declaration regarding the Clinic's responsibility for providing medical malpractice "tail coverage." Defendants also filed an emergency motion for a temporary restraining order (TRO) and preliminary injunction to immediately enjoin the plaintiffs from further violating the restrictive covenants in their employment contracts.[3]

The trial court granted defendants a TRO, which was later amended to permit Drs. Ramadurai and Mohanty, for a limited time, to provide critical care to their hospitalized patients. The trial court also required defendants to post a $100,000 surety bond. The matter was then set for hearing on whether defendants were entitled to a preliminary injunction.

Plaintiffs filed answers to defendants' countercomplaint and also raised affirmative defenses to defendants' request for injunctive relief, alleging, as they had done in their declaratory judgment actions, that the restrictive covenants were unenforceable. The dates set for hearing

---

[3]In July 2003, Drs. Mohanty and Ramadurai left the Clinic but continued to practice medicine within the restricted area and see patients at the restricted hospitals, in violation of the covenants in their employment contracts.

on the motion for preliminary injunction were continued from time to time to permit plaintiffs to conduct extensive discovery, particularly with regard to defendants' billing practices. When discovery was completed, plaintiffs filed a "Trial Brief In Opposition To Counter-Plaintiffs' Request For A Preliminary Injunction." In this document, plaintiffs restated their position that defendants were not entitled to injunctive relief because the restrictive covenants were not enforceable. However, plaintiffs' argument now centered on three main points: (1) that they should not be held to the terms of the restrictive covenant in their contracts because defendants materially breached the employment contracts by improperly billing for a certain medical procedure, namely, the myoview test (otherwise referred to as the thallium stress test), which resulted in decreased revenue for plaintiffs; (2) that the restrictive covenants in their contracts were unreasonable because they caused undue hardship to plaintiffs, were injurious to the public, and were excessive in their temporal scope, and because defendants had no protectable business interest in patients who had been referred to plaintiffs from other sources; and (3) that *all* restrictive covenants in physician contracts should be held void as against public policy in Illinois. With regard to this last point, plaintiffs argued that, even if *all* restrictive covenants were not void, restrictive covenants should be held void where the employee terminates the contract due to illegal or unethical conduct by the employer, whether or not such conduct amounts to a breach of contract.

In November and December 2003, the trial court held hearings on whether to grant defendants a preliminary injunction. The hearings took place over the course of six days, at which time the court heard the testimony of seven witnesses and received 41 exhibits into evidence. Subsequently, plaintiffs submitted a "Trial Memorandum of Law of the Applicable Medicare Rules and Regulations" as additional support for their claim that defendants had improperly billed Medicare for the myoview test. Both plaintiffs and defendants also submitted, in writing, extensive closing argument.

On February 20, 2004, the trial court entered a ruling, denying defendants' request for preliminary injunctive relief. Stating on the record that it had considered all of the evidence and arguments of the parties, the trial court made the following findings. First, the court

rejected plaintiffs' claim that defendants had materially breached the employment contracts. The court held:

> "The Court is not satisfied that the evidence adduced at hearing proves by a preponderance that the employment agreements were materially breached."

The trial court then considered whether the restrictive covenants in plaintiffs' contracts were reasonable in geography, time and activity. In this regard, the court held that the geographic limitations "are well within the ranges of proof by reported case law." The court found the temporal restrictions "somewhat problematic," not because it believed them to be excessive, but because of the reasons Dr. Monteverde gave for imposing them. The court noted that, although Dr. Monteverde testified that three to five years was the amount of time it took to develop a referral base, he also testified that the three-year restriction imposed on Dr. Ramadurai "just came into his mind" and the five-year restriction was imposed on Dr. Mohanty because Dr. Monteverde "did not trust him." The trial court then went on to conclude that a preliminary injunction should not be granted because the activity restriction in the restrictive covenant was greater than necessary to protect the defendants' interests. The covenants restricted "the practice of medicine" when the Clinic's practice specialty was cardiology. Thus, the trial court found the restriction to be "overly broad and unreasonable." The trial court permitted the TRO, which had remained in effect until that time, to continue for an additional 21 days until defendants filed their appeal.

The appellate court reversed, finding that the restriction on the practice of medicine within the narrowly drawn geographic limits would not cause plaintiffs undue hardship and was not greater than necessary to protect the defendants' interests. 358 Ill. App. 3d 902. The appellate court declined plaintiffs' invitation to declare all restrictive covenants in medical employment contracts void in Illinois as against public policy. The court also refused to review plaintiffs' claim that defendants materially breached the employment contract. The court held this issue was being raised prematurely because the appeal was interlocutory, having been taken from the trial court's order denying defendants a preliminary injunction. The appellate court stated, "plaintiffs must wait for a hearing on the merits to determine if the defendants breached the employment contracts in a material way

that would void the restrictive covenants." The cause was remanded with directions that a preliminary injunction be granted defendants pending further hearings.

Plaintiffs petitioned this court for leave to appeal (177 Ill. 2d R. 315), which this court granted.

## ANALYSIS

In the case at bar, defendants sought, by way of a countercomplaint, a preliminary injunction to enjoin plaintiffs from violating the restrictive covenants contained in their employment contracts. Defendants, as the parties seeking the preliminary injunction, were required to demonstrate (1) a clearly ascertained right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case. *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164 (2002); *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.*, 195 Ill. 2d 356, 365 (2001). "On appeal, we examine only whether the party seeking the injunction has demonstrated a *prima facie* case that there is a fair question concerning the existence of the claimed rights." *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d at 177, citing *Callis*, 195 Ill. 2d at 366. A decision to grant or deny a preliminary injunction is generally reviewed for an abuse of discretion. *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.*, 195 Ill. 2d 356 (2001). However, whether injunctive relief should issue to enforce a restrictive covenant not to compete in an employment contract depends upon the validity of the covenant, the determination of which is a question of law. *Retina Services, Ltd. v. Garoon*, 182 Ill. App. 3d 851, 856 (1989). See also *Woodfield Group, Inc. v. DeLisle*, 295 Ill. App. 3d 935, 938 (1998) ("determination of whether a restrictive covenant is enforceable is a question of law"). Accordingly, we review that determination *de novo*. *The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 215 (2005).

## Mootness

A court should not decide a case where the occurrence of events after an appeal has been filed make it impossible for the reviewing

-7-

court to render effectual relief and the judgment would have only an advisory effect. *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 7-8 (1997). In the case at bar, it is apparent from the record that the restrictive covenant in Dr. Ramadurai's employment contract prohibited him, upon termination, from practicing medicine within the restricted area for a period of three years. Because Dr. Ramadurai left the Clinic in July 2003, that time period has now lapsed. For this reason, it is appropriate for this court to consider whether the appeal has become moot with respect to Dr. Ramadurai.

After careful consideration we find that Dr. Ramadurai's appeal is not moot. As we stated in *Berlin*, "where a decision 'could have a direct impact on the rights and duties of the parties' there is life in the appeal." *Berlin*, 179 Ill. 2d at 8, quoting *People ex rel. Bernardi v. City of Highland Park*, 121 Ill. 2d 1, 6-7 (1988). In the case at bar, defendants' countercomplaint, which raises claims of misappropriation and unjust enrichment, seeks damages for harm allegedly incurred and revenues allegedly lost as a result of violations of the restrictive covenant by Drs. Mohanty and Ramadurai. Consequently, a decision as to the enforceability of the restrictive covenants could have a direct impact on Dr. Ramadurai's rights and obligations in these matters. Accordingly, we conclude that the appeal is not moot as to Dr. Ramadurai.

Enforceability of the Restrictive Covenants

In opposition to defendants' motion for preliminary judgment, plaintiffs raised various affirmative defenses challenging the validity and enforceability of the restrictive covenants in their employment contracts. These claims were rejected by the courts below. Now, in their appeal before this court, plaintiffs argue once again that defendants are not entitled to a preliminary injunction to enforce the restrictive covenants in their employment contracts because the covenants are not enforceable. Plaintiffs affirmatively challenge the enforceability of the restrictive covenants, advancing three separate theories. First, they contend that all restrictive covenants in physician employment contracts should be held void and unenforceable because they are against the public policy of this state. Second, plaintiffs contend that defendants materially breached the employment contracts, thereby relieving plaintiffs of their obligations under the

restrictive covenants. Third, plaintiffs contend that the restrictive covenants in their employment contracts may not be enforced because they are overly broad in their temporal and activity restrictions and, thus, unreasonable.

We first address the contention that restrictive covenants in physician employment contracts should be held void as against public policy in Illinois. Initially, we note that this court has a long tradition of upholding the right of parties to freely contract. *Vine Street Clinic v. Healthlink, Inc.*, 222 Ill. 2d 276 (2006). Consequently, our decisions have held that a private contract, or provision therein, will not be declared void as contrary to public policy unless it is " 'clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy' "or it is clearly shown that the contract is " 'manifestly injurious to the public welfare.' " *Vine Street Clinic v. Healthlink, Inc.*, 222 Ill. 2d at 300, quoting *Schumann-Heink v. Folsom*, 328 Ill. 321, 330 (1927). See also *Barr v. Kelso-Burnett Co*., 106 Ill. 2d 520 (1985); *Palmateer v. International Harvester Co*., 85 Ill. 2d 124 (1981) (the public policy of the state is to be found in its constitution and statutes and, when they are silent, then in its judicial decisions and constant practice of its governmental officials). We have strictly adhered to the position that the public policy of the state is not to be determined by " ' "the varying opinions of laymen, lawyers or judges as to the demands of the interests of the public." ' " *Groome v. Freyn Engineering Co*., 374 Ill. 113, 124 (1940), quoting *Zeigler v. Illinois Trust & Savings Bank*, 245 Ill. 180, 193 (1910). As a result, plaintiffs carry a heavy burden of showing that restrictive covenants in physician employment contracts are against the public policy of this state.

In attempting to meet this burden, plaintiffs first point to our decision in *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 482 (1998), wherein we held that, in Illinois, restrictive covenants in attorney employment contracts are void as a matter of public policy. Citing to the appellate court decision in *Carter-Shields v. Alton Health Institute*, 317 Ill. App. 3d 260 (2000), plaintiffs argue that the public policy reasons for finding restrictive covenants in physician employment contracts void are even more compelling than the reasons advanced with respect to attorney employment contracts. Plaintiffs provide a laundry list of the possible adverse effects of allowing

restrictive covenants in physician employment contracts, namely, that restrictive covenants in physician employment contracts interfere with the doctor-patient relationship, deny patients the freedom to choose their own doctor, create barriers to the delivery of quality medical care, hinder competition, and often force patients to incur the additional expense of duplicative testing. In addition to these patient concerns, plaintiffs argue that restrictive covenants place unreasonable limits on physicians' autonomy and freedom of movement. Plaintiffs conclude that our decision in *Dowd & Dowd* and the appellate court decision in *Carter-Shields* provide a strong foundation upon which to find that covenants restricting skilled professionals from practicing their trade are contrary to the public policy of this state. We disagree.

The appellate decision in *Carter-Shields,* upon which plaintiffs primarily rely, was vacated by this court in *Carter-Shields v. Alton Health Institute*, 201 Ill. 2d 441 (2002), and, as such, carries no precedential weight. Moreover, the appellate decision in *Carter-Shields* stands alone in its rejection of long-standing Illinois precedent on the validity of restrictive covenants in physician employment contracts. See *Prairie Eye Center, Ltd. v. Butler*, 329 Ill. App. 3d 293 (2002).

Moreover, in *Dowd*, our determination that noncompetition covenants in attorney employment contracts were void was grounded in the fact that such covenants were in direct "conflict with Rule 5.6" of the Illinois Rules of Professional Conduct, which gave expression to important considerations of public policy. *Dowd*, 181 Ill. 2d at 481-83. Thus, we held, "it would be inimical to public policy to give effect to the offending provisions." *Dowd*, 181 Ill. 2d at 482-83. In the present case, there are no similar expressions of public policy which require us to find restrictive covenants in the employment contracts of medical practitioners unenforceable in Illinois.

Plaintiffs, however, direct our attention to an opinion of the AMA's Council on Ethical and Judicial Affairs, which states:

> "Covenants-not-to-compete restrict competition, disrupt continuity of care, and potentially deprive the public of medical services. The Council of Ethical and Judicial Affairs *discourages* any agreement which restricts the right of a physician to practice medicine for a specified period of time or in a specified area upon termination of an employment,

partnership, or corporate agreement. Restrictive covenants are unethical if they are excessive in geographic scope or duration in the circumstances presented, or if they fail to make reasonable accommodation of patients' choice of physician." (Emphasis added.) AMA Council on Ethical and Judicial Affairs, Op. E–9.02 (1998).

Plaintiffs contend that AMA Opinion 9.02 provides the necessary expression of public policy which would permit us to invalidate restrictive covenants in physician employment contracts. Again, we must disagree.

AMA Opinion 9.02, while informative, is not the equivalent of an Illinois statute or rule of professional conduct and, for that reason, does not provide a clear expression of the public policy of this state. Thus, AMA Opinion 9.02 cannot dictate the manner in which restrictive covenants should be construed in Illinois. That having been said, we point out that Opinion 9.02 does not prohibit, but merely *discourages,* restrictive covenants in medical employment contracts. Furthermore, the AMA's position on restrictive covenants, as set forth in Opinion 9.02, is commensurate with the manner in which restrictive covenants in physician employment contracts are treated in this state. Historically, covenants restricting the performance of medical professional services have been held valid and enforceable in Illinois as long as their durational and geographic scope are not unreasonable, taking into consideration the effect on the public and any undue hardship on the parties to the agreement. *Cockerill v. Wilson*, 51 Ill. 2d 179, 183-84 (1972); *Canfield v. Spear*, 44 Ill. 2d 49 (1969). Thus, the AMA provision is no different from the common law requirements of this state. See *Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 112 P.3d 81 (2005) (AMA requirements are no different from common law requirement that restrictive covenants be reasonable and not adverse to the public welfare).

We are similarly unpersuaded by plaintiffs' references to other jurisdictions. Plaintiffs contend that "states such as Colorado, Delaware and Massachusetts have concluded that physician restrictive covenants violate public policy." What they fail to acknowledge, however, is that in Colorado, Delaware, and Massachusetts restrictive covenants in medical employment contracts are totally prohibited based on legislative enactments.

Plaintiffs' citation to *Murfreesboro Medical Clinic, P.A. v. Udom*, 166 S.W.3d 674, 681 (Tenn. 2005), is similarly flawed. Plaintiffs claim that "*Murfreesboro* directly supports a holding by this court that physician restrictive covenants violate public policy." However, in *Murfreesboro*, the Supreme Court of Tennessee held a restrictive covenant unenforceable because noncompete covenants in physician employment contracts were, by statute, permitted in only "two limited circumstances and with closely prescribed restrictions," which were inapplicable.

While it is true that some jurisdictions prohibit restrictive covenants in physician employment contracts on public policy grounds, our research has been unable to reveal any case in which a court has altogether outlawed restrictive covenants in physician employment contracts in the absence of some legislative enactment. Moreover, the vast majority of jurisdictions follow "the modern view," which is that restrictive covenants are enforceable if they are "supported by consideration, ancillary to a lawful contract, and reasonable and consistent with the public interest." F. Tinio, Annotation, *Validity and Construction of Contractual Restrictions on Right of Medical Practitioner to Practice, Incident to Employment Agreement*, 62 A.L.R.3d 1014, 1020 (1975). Thus, the majority of jurisdictions employ the same reasonableness standard that this court has consistently applied when deciding the enforceability of restrictive covenants in medical employment contracts in Illinois.

As stated earlier, when a party seeks to show that a contract term is against the public policy of this state, that party bears the burden of showing that the contract term is " 'clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy' "or that the contract is " 'manifestly injurious to the public welfare.' " *Vine Street Clinic*, 222 Ill. 2d at 300, quoting *Schumann-Heink v. Folsom*, 328 Ill. 321, 330 (1927). In the case at bar, plaintiffs have failed to show that physician restrictive covenants are contrary to the constitution, statutes or judicial decisions of this state. Nor have they shown that these covenants are manifestly injurious to the public welfare. Although plaintiffs have offered reasons for finding that restrictive covenants should be disfavored in physician employment contracts, countervailing reasons exist which would militate against any deviation from our long-standing practice

of finding reasonable restrictive covenants in medical employment contracts enforceable. Restrictive covenants protect the business interests of established physicians and, in this way, encourage them to take on younger, inexperienced doctors. Accordingly, restrictive covenants can have a positive impact on patient care. We do not know, and are ill-equipped to determine, what the possible consequences might be if we were to adopt the sweeping changes plaintiffs advocate. It is possible that patients would be more adversely affected if we were to ban reasonable restrictive covenants in physician employment contracts. For this reason, we believe that prohibiting restrictive covenants in medical practice contracts is a decision better left to the legislature, where the competing interests can be fully aired. Accordingly, plaintiffs' first claim is rejected.

We now turn to plaintiffs' second claim–that a prior material breach of the employment contracts by defendants relieves them of their obligations under the restrictive covenants.

Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations. *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324 (2005). This principle was applied in *Galesburg Clinic Ass'n v. West*, 302 Ill. App. 3d 1016, 1018 (1999). In *Galesburg*, a medical association sought to enforce a noncompete covenant in the partnership agreement when two of the partners (defendants) quit. The defendants filed a counterclaim alleging that the association had breached the partnership agreement, discharging them of their duties under the covenant. The trial court ruled in the defendants' favor, finding a material breach by the association. On appeal, the appellate court affirmed, holding that "a breach *** can operate to discharge the duties of a covenant not to compete where the breach is material." See also *C.G. Caster Co. v. Regan*, 88 Ill. App. 3d 280 (1980) (where one party materially breaches the contract, the restrictive covenant in the contract may no longer be binding on the other party). In the case at bar, plaintiffs ask us to apply the reasoning in *Galesburg* to this case.

Initially, we note that, in the trial court, plaintiffs originally asserted that defendants breached the plaintiffs' employment contracts in a number of ways. However, after discovery was completed, plaintiffs restricted their argument to one claim–that defendants

-13-

materially breached the employment contracts by improperly billing Medicare for myoview tests ordered by plaintiffs for their patients. The trial court rejected plaintiffs' claim, finding that the evidence presented by plaintiffs did not establish that defendants breached the employment contracts. The appellate court, having reversed the trial court's denial of the preliminary injunction on other grounds, refused to consider this issue, holding that plaintiffs "must wait for a hearing on the merits." 358 Ill. App. 3d at 910-11.

Plaintiffs contend that the appellate court erred. According to plaintiffs, the appellate court ignored the fact that "a full evidentiary hearing in the form of a trial was already held" on the matter. Plaintiffs maintain that we must consider this claim because a determination on whether defendants breached the employment contracts is necessary to a decision on whether the restrictive covenants are enforceable. Plaintiffs also claim that the trial court's ruling on the matter of their breach-of-contract claim involved contract interpretation, which is an issue of law and, as a result, our review should be *de novo*.

Defendants, on the other hand, initially argue that plaintiffs failed to appeal the trial court's adverse ruling on the breach-of-contract claim and, thus, have forfeited review of this issue. Putting aside forfeiture, defendants maintain that the trial court correctly determined that defendants did not materially breach the employment contracts. Defendants maintain, however, that the breach of contract issue is a question of fact and that, on review, we may not disturb the trial court's ruling unless it is against the manifest weight of the evidence.

The overriding issue in the appeal at bar is the enforceability of the restrictive covenants in the employment contracts of Drs. Mohanty and Ramadurai. Because a prior breach of contract by defendants could render the restrictive covenants in the employment contracts unenforceable, we conclude that consideration of the breach of contract claim is necessary to our determination regarding the enforceability of the covenants. We agree with defendants that whether or not a material breach of contract has been committed is a question of fact and, consequently, the lower court's determination will not be disturbed unless it is against the manifest weight of the evidence. *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.*, 115 Ill. 2d 119 (1986); see also *Borys v. Rudd*, 207 Ill. App. 3d 610 (1990).

It is plaintiffs' position that defendants breached their employment contracts by failing to compensate plaintiffs the full amounts to which they were entitled under the provisions of their contracts. According to plaintiffs, they were significantly underpaid because of the manner in which defendants billed Medicare for myoview tests performed at the Clinic at plaintiffs' direction.

The record shows that the myoview test (also known as a myocardial perfusion imaging study) is a diagnostic test used to determine whether the heart muscle is getting the blood supply it needs. The Clinic owned and maintained at its offices all of the equipment necessary to conduct myoview tests. The Clinic also had on its staff a trained technician who would administer the myocardial imaging phases of the tests. When conducting a myoview test, the Clinic's trained technician would first inject a small amount of radioactive isotope (thallium) into the patient's bloodstream and then take pictures of the patient using a special camera for the initial "resting phase" of the test. After the resting images were taken, the patient would take a stress test on a treadmill under the supervision of a physician. Thereafter, the technician would administer an additional injection to the patient and repeat the myocardial imaging process. The images would later be interpreted by the physician.[4]

In regard to billing for the myoview test, Medicare assigned separate Current Procedural Terminology Codes (CPT Codes) for the technical and professional components of the test. According to defendants' expert witness, Janet Mazur,[5] the technical components of a procedure, billed under the "TC" CPT Code, are intended to cover overhead, technician salaries, equipment and equipment maintenance. See also *Central States v. Pathology Laboratories of Arkansas, P.A.*, 71 F.3d 1251, 1252 (7th Cir. 1995). The professional component of a procedure compensates the physician who interprets the test and is billed under the CPT Code "26."

---

[4]Apparently, Dr. Mohanty interpreted most of the myoview tests due to his special training in nuclear cardiology.

[5]Mazur is a "coding specialist" with over 30 years of experience in the health-care field, including CPT Code billing and Medicare reimbursements.

It is uncontested that when billing Medicare for myoview tests performed at the Clinic's offices, the technical components of the test were billed under Dr. Monteverde's name, while the professional component was billed under name of the physician who interpreted the test. Dr. Monteverde explained that he directed the billing for the technical component to be billed under his name to defray the costs of the initial $300,000 investment for the purchase of the myoview equipment, as well as remodeling costs necessary to accommodate the equipment. He further explained that Medicare's reimbursement for the technical component covered the salary of the licensed technician who administered the test, as well as the costs of medication, supplies and other overhead expenses associated with the test. Dr. Monteverde further testified that he believed it appropriate to bill the technical component under his name because he was the sole owner of the Clinic and the myoview testing equipment, as well as the person responsible for the training and supervision of the technician, who administered all of the myoview tests at the Clinic, regardless of which physician ordered the test.

Plaintiffs, nevertheless, contend that Dr. Monteverde's billing procedure was improper. Specifically, plaintiffs argue that the technical component of the myoview test, which accounts for about 70% of the total cost of the test, was wrongly diverted to Dr. Monteverde and, thus, deprived them of compensation to which they were entitled under the terms of their employment contract. Plaintiffs' employment contracts provided that plaintiffs were to receive an annual salary of 50% of their gross receipts.[6] They maintain that their "gross receipts" should have been calculated based on the total cost of the myoview tests performed at the Clinic on their patients, not just the professional component.

The employment contracts of Drs. Mohanty and Ramadurai provide: "Employee shall be paid as follows *for his work*: 50% of his gross receipts." (Emphasis added.) At the hearings conducted by the trial court, defendants argued that the technical component of the myoview tests did not constitute Dr. Mohanty's or Dr. Ramadurai's "work" and, thus, there was no violation of the employment contract.

---

[6]Dr. Ramadurai's contract was amended at some point to afford him 55% of his gross receipts.

It was necessary, therefore, for the trial court to resolve the question of whether the technical components of the myoview tests were part of plaintiffs' "work."

Plaintiffs proffered the testimony and report of an expert to support their contention that they were entitled to a share in the total amount charged to Medicare for the myoview test. However, defendants challenged the qualifications of plaintiffs' expert and the trial court barred this witness' testimony. As a result, plaintiffs position is largely unsupported.

Defendants' expert, on the other hand, provided strong testimony in defense of defendants' billing practices. According to defendants' expert, Janet Mazur, billing for the technical component does not include any amounts for physician services. In a detailed report, Mazur explained the formulas used by Medicare to determine "Physician Work Relative Value Units" which is a reflection of a physician's "work" for a particular CPT Code. According to Mazur, the "TC" CPT Codes for the myoview test all carry a Physician Work Relative Value Unit of zero. Thus, Mazur concluded that "the technical component of these tests, and corresponding payments for each component, does not encompass physician work."

In light of the evidence presented by defendants' expert, we cannot say that it was against the manifest weight of the evidence for the trial court to determine that a material breach of contract was not established. We affirm the trial court's ruling on this matter and find that, because plaintiffs have not carried their burden of proving a breach of contract by defendants, plaintiffs have not shown why they should be relieved of their obligations under the restrictive noncompete covenants in their contracts. Accordingly, plaintiffs' breach-of-contract claim cannot serve as a basis upon which to deny defendants a preliminary injunction.

Plaintiffs raise as their third and final issue whether the restrictive covenants in their employment contracts are unenforceable because they are unreasonably overbroad in their temporal and activity restrictions. The restrictive covenant in Dr. Ramadurai's contract imposed a three-year restriction on his practice of medicine within a two-mile radius of the Clinic's offices. The restrictive covenant in Dr. Mohanty's contract limited his ability to practice medicine for five years within a five-mile radius of the Clinic's offices.

As noted earlier in this opinion, this court has a long tradition of upholding covenants not to compete in employment contracts involving the performance of professional services when the limitations as to time and territory are not unreasonable. *Cockerill v. Wilson*, 51 Ill. 2d 179, 183-84 (1972); *Canfield v. Spear*, 44 Ill. 2d 49 (1969); *Bauer v. Sawyer*, 8 Ill. 2d 351 (1956). " 'In determining whether a restraint is reasonable it is necessary to consider whether enforcement will be injurious to the public or cause undue hardship to the promisor, and whether the restraint imposed is greater than is necessary to protect the promisee.' " *House of Vision, Inc. v. Hiyane*, 37 Ill. 2d 32, 37 (1967), quoting *Bauer v. Sawyer*, 8 Ill. 2d 351, 355 (1956).

The trial court, when considering the reasonableness of the covenants here, ruled that the activity restriction was unreasonably overbroad because the restriction on "the practice of medicine" was greater than necessary to protect the interests of defendants, who specialized in the practice of cardiology. The appellate court rejected this ruling, holding:

> "Based on the testimony, it is not a greater restraint than necessary to protect the defendants. Dr. Ramadurai pointed out, as a doctor, he is licensed to practice medicine, not just his specialties. Just as Dr. Monteverde saw patients for conditions unrelated to internal medicine or cardiology, the plaintiffs' specialties do not prevent them from seeing patients in other areas of medicine, if they so chose, placing them in competition with the defendants." 358 Ill. App. 3d at 908.

In addition, the appellate court found that no undue hardship would accrue to plaintiffs as a result of the covenants because: "They are free to practice medicine outside the five-mile limit, which, given the heavily populated Chicago metropolitan area, would not deprive them of employment." 358 Ill. App. 3d at 908.

Plaintiffs contest the correctness of the appellate court's ruling and ask us to affirm the circuit court's judgment on this point. We, however, find the appellate court's reasoning to be persuasive and, accordingly, affirm its ruling.

Under the circumstances of this case, the restriction on the "practice of medicine" is not unreasonable. Cardiology, like other specialties, is inextricably intertwined with the practice of medicine.

-18-

For this reason, restrictive covenants precluding the practice of medicine against physicians who practice a specialty have been upheld as reasonable. See *Canfield v. Spear*, 44 Ill. 2d 49 (1969) (dermatologist); *Prairie Eye Center, Ltd. v. Butler*, 329 Ill. App. 3d 293 (2002); *Retina Services, Ltd. v. Garoon*, 182 Ill. App. 3d 851 (1989) (ophthalmologists). Thus, we find that the restraint on the practice of medicine, here, was not greater than necessary to protect defendants' interests. This is particularly so because the restriction on plaintiffs is in effect only within a narrowly circumscribed area of a large metropolitan area. As the appellate court noted, the two- and five-mile restrictions will not cause plaintiffs any undue hardship. Moreover, plaintiffs do not suggest that a more narrowly drawn activity restriction would have been practicable.

Next, plaintiffs argue, as they did in the appellate court below, that the temporal restrictions found in their covenants are unreasonable and that the trial court held them to be so. Like the appellate court, however, we find plaintiffs' argument to be factually and substantively incorrect.

The trial court found the temporal restrictions to be "problematic." The trial court acknowledged that there was evidence in the record which would support a finding that the three- and five-year restrictions were reasonable, but then found it "significant" that Dr. Monteverde testified that the three-year restriction for Dr. Ramadurai "just came into his mind" and the five-year restriction was imposed on Dr. Mohanty because Dr. Monteverde did not trust him. It does not appear, however, that the trial court actually concluded that the temporal restrictions were unreasonable.

In any event, we do not agree that Dr. Monteverde's candid remarks are cause for concern. Courts, when assessing the reasonableness of restrictive covenants, are to apply an objective standard, informed by the individual facts of the case. Thus, Dr. Monteverde's personal, subjective motivations for imposing the particular temporal restrictions are irrelevant as long as the limitations satisfy an objective standard of reasonableness. We find that they do.

Record evidence indicated that it took more than 10 years for St. John Clinic to establish itself as a successful cardiology practice. Dr. Monteverde testified that it took a minimum of three to five years to develop a referral base and that during the time that Drs. Ramadurai

and Mohanty worked for the Clinic, nearly all of their referrals had come through the Clinic. Further, Dr. Monteverde testified that from1989, when Dr. Ramadurai was hired, to 2001, when Dr. Mohanty was hired, the practice of cardiology had become much more competitive. There were more cardiologists in the area, which meant that a greater number of doctors were available to serve a limited number of cardiology patients in the area. There is nothing to indicate that the trial court did not find Dr. Monteverde's testimony to be credible. More importantly, plaintiffs have never presented any evidence to refute it. We cannot say, therefore, that the three- and five-year restrictions are unreasonable under the circumstances of this case. We note, too, that similar restrictions in other restrictive covenants have been upheld as reasonable. *Cockerill v. Wilson*, 51 Ill. 2d 179 (1972) (five-year restriction); *Canfield v. Spear*, 44 Ill. 2d 49 (1969) (three years); *Bauer v. Sawyer*, 8 Ill. 2d 351 (1956) (five-year restriction).

Finally, plaintiffs argue that, with their absence from the Clinic, *the Clinic* will be unable to handle its patient load. This argument is unresponsive to the issue here–whether the temporal restriction is greater than necessary to protect defendants' interests. The measure of the potential harm to the public caused by the restriction is whether there exists a sufficient number of cardiologists *in the area* to meet patient needs. Plaintiffs do not contest defendants' evidence on this point. Thus, we cannot say that barring plaintiffs from the practice of medicine within the restricted area for the stated time periods would seriously diminish the number of cardiologists available to provide the necessary patient care. Therefore, we conclude that the three- and five-year time restrictions on the plaintiffs' ability to practice medicine within the limited geographical area was reasonable and necessary to protect the Clinic's interests.

## CONCLUSION

In opposition to defendants' motion for a preliminary injunction, plaintiffs contested the validity and reasonableness of the restrictive covenants contained in their employment contracts. We have rejected each of plaintiffs' arguments and, as a result, conclude that defendants are entitled to a preliminary injunction to enforce the restrictive

covenants contained in plaintiffs' employment contracts. We affirm the appellate court's judgment.

*Appellate court judgment affirmed.*

JUSTICE KARMEIER, specially concurring:

I fully concur in the court's judgment. I join its opinion with the understanding that it should not be read as altering any of the normal standards governing cases of this kind.

As the appellate court recognized, this is an interlocutory appeal as of right brought pursuant to Supreme Court Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)) from a judgment of the circuit court denying defendants' motion for a preliminary injunction. It is well established that the purpose of a preliminary injunction is not to resolve the merits of a case, but to preserve the status quo until the merits can be decided. *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.*, 195 Ill. 2d 356, 365 (2001). Consistent with the provisional nature of this remedy, a party seeking preliminary injunctive relief is not required to make out a case which would entitle him to final judgment; rather, he need only show that he raises a "fair question" and that the court should preserve the status quo until it can decide the case on the merits. *Buzz Barton & Associates, Inc. v. Giannone*, 108 Ill. 2d 373, 382 (1985).

The issuance of a preliminary injunction is an extreme remedy and should not be undertaken unless an emergency exists and serious harm would result if the injunction were not issued. As my colleagues indicate, the party seeking a preliminary injunction must establish that (1) a clearly ascertained right in need of protection exists, (2) irreparable harm will occur in the absence of an injunction, (3) there is not an adequate remedy at law, and (4) there is a likelihood of success on the merits. *Callis, Papa, Jackstadt & Halloran, P.C.*, 195 Ill. 2d at 365-66. The decision to grant or deny a preliminary injunction rests within the sound discretion of the trial court and on review the decision will not be disturbed absent an abuse of discretion. *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 177 (2002).

In this case, there is no dispute regarding elements (1), (2) and (3), the existence of a clearly ascertainable right in need of protection, irreparable injury and the lack of an adequate remedy at law. The sole

issue is whether defendants, who were seeking the preliminary injunction, made a fair showing that the restrictive covenants were valid and enforceable and that they were therefore likely to succeed on the merits of their claim against plaintiffs.

The majority correctly points out that the validity of covenants not to compete contained in employment contracts is a question of law (see *Retina Services, Ltd. v. Garoon*, 182 Ill. App. 3d 851, 856 (1989); see also *Woodfield Group, Inc. v. DeLisle*, 295 Ill. App. 3d 935, 938 (1998) ("determination of whether a restrictive covenant is enforceable is a question of law")) which we review *de novo* (*The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 215 (2005)). The situation here, however, is more complex. That is because plaintiffs' challenge to the enforceability of the restrictive covenants includes, by way of an affirmative defense, the claim that defendants had breached the employment contracts of which the covenants were a part. Whether a breach of contract has occurred is not a legal question subject to *de novo* review. It is a question of fact which will not be disturbed unless the finding is against the manifest weight of the evidence. See *Bunge Corp. v. Northern Trust Co.*, 252 Ill. App. 3d 485, 499 (1993).

Normally, affirmative defenses such as breach of contract may not be litigated on the merits in the context of a hearing on a motion for preliminary injunctive relief. See, *e.g.*, *Falcon, Ltd. v. Corr's Natural Beverages, Inc.*, 165 Ill. App. 3d 815, 820 (1987). The reason for this rule, as the appellate court recognized, is that resolution of such matters requires the determination of controverted rights and resolution of matters bearing on the merits of the underlying case. Under established precedent, those are not appropriate objectives for proceedings seeking preliminary injunctive relief. As I have already indicated, preliminary injunctions precede hearings on the merits, and their purpose is not to decide the merits of a case, but to maintain the status quo and prevent a threatened wrong until the merits can be decided.

Although the majority makes no attempt to reconcile its approach with these principles, I believe that it has acted properly. What sets this litigation apart is that instead of deferring the hearing on the merits of the breach of contract claim until the trial, both plaintiffs and defendants elected to make an extensive evidentiary record on the

-22-

question. In effect, the hearing on the breach of contract defense was treated as the actual trial on that issue. The situation is directly analogous to one where the parties expressly agree that the evidence presented in connection with a preliminary injunction should stand as the record for purposes of entering final judgment on the merits. See, *e.g.*, *City of Chicago v. Pooh Bah Enterprises, Inc.*, No. 99804 (October 5, 2006). Under these circumstances, the parties cannot possibly complain that addressing the breach of contract issues exceeds the permissible scope of our inquiry in this case. I note, moreover, that none of the parties has given any indication that additional relevant evidence exists that has not already been introduced. To refrain from deciding the breach of contract issues notwithstanding the existence of the fully developed evidentiary record already before us would serve no useful purpose.

For the foregoing reasons, I concur in court's the judgment. Subject to the points raised in this separate concurrence, I also join its opinion.

JUSTICE GARMAN joins in this special concurrence.

JUSTICE FREEMAN, concurring in part and dissenting in part:
The appellate court upheld the physician restrictive covenants in the present case, and this court affirms. In so doing, my colleagues in the majority give short shrift to the essential issue of patient care. I write separately because fuller consideration of the issue of patient care is crucial to an enlightened resolution of the parties' contentions.

The issue of patient care is fraught with opposing public policy considerations. Further, the issue of patient care is so intertwined with the enforceability of physician restrictive covenants that a blanket prohibition thereof must come from the legislature and not the courts. Therefore, I agree with my colleagues' conclusion on this point. Nevertheless, because consideration of patient care is so important in enforcing individual physician restrictive covenants, including not only the patient's freedom to choose a physician but also the patient's interests in maintaining an established physician-patient relationship, I believe that the prevailing analysis is inadequate. In my view, the court today lets pass the opportunity to revisit this important issue and modify our analysis.

Accordingly, I propose a modified analysis that more appropriately considers the fundamental element of patient care. The record before us does not contain sufficient evidence to establish this crucial consideration. Therefore, I cannot uphold these restrictive covenants. Rather, I would reverse the judgments below and remand the cause to the circuit court for additional fact finding.

## I. BACKGROUND

A physician restrictive covenant is a clause typically found in employment agreements between physicians and their employers. Usually, employers require physicians to sign such covenants prior to beginning their practice. The contractual clauses obligate physicians to refrain from engaging in or establishing a competitive medical practice within a specified geographic region for a specified period of time subsequent to the conclusion or termination of the physician's employment. The restrictive covenant typically will also prohibit a physician from treating patients at hospitals within the same geographic region. S. Malloy, *Physician Restrictive Covenants: The Neglect of Incumbent Patient Interests*, 41 Wake Forest L. Rev. 189, 189-90 (2006); accord D. Loeser, *The Legal, Ethical, and Practical Implications of Noncompetition Clauses: What Physicians Should Know Before They Sign*, 31 J.L. Med. & Ethics 283, 283-84 (2003); P. Berg, *Judicial Enforcement of Covenants Not To Compete Between Physicians: Protecting Doctors' Interests At Patients' Expense*, 45 Rutgers L. Rev. 1, 2-3 (1992). Terms such as "restrictive covenant," "noncompete agreement," and "covenant not to compete" are synonymous and used interchangeably. 41 Wake Forest L. Rev. at 189 n.2; 45 Rutgers L. Rev. at 2 n.9. In the present case, the appellate court, *inter alia*: (1) found that plaintiffs' postemployment restrictive covenants were reasonable (358 Ill. App. 3d 902, 906-09), and (2) rejected plaintiffs' contention that physician postemployment restrictive covenants in Illinois are void as against public policy. 358 Ill. App. 3d at 911.

## II. ANALYSIS

The purpose of a preliminary injunction is to preserve the status quo pending a decision on the merits of a cause. A preliminary injunction is an extreme remedy that a court should employ only in

situations where an emergency exists and serious harm would result if the injunction is not issued. *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.*, 195 Ill. 2d 356, 365 (2001). As my colleagues in the majority observe, a party seeking a preliminary injunction must establish that: (1) a clearly ascertained right in need of protection exists; (2) irreparable harm will occur without the injunction; (3) there is no adequate remedy at law for the injury; and (4) there is a likelihood of success on the merits. Slip op. at 7; *Callis*, 195 Ill. 2d at 365-66. The decision to grant or deny a preliminary injunction rests within the sound discretion of the circuit court, whose decision will not be disturbed on review absent an abuse of discretion. *Callis*, 195 Ill. 2d at 366.

In this case: "The sole issue is whether defendants, who were seeking the preliminary injunction, made a fair showing that the restrictive covenants were valid and enforceable and that they were therefore likely to succeed on the merits of their claim against plaintiffs." Slip op. at 22 (Karmeier, J., specially concurring, joined by Garman, J.). Whether a restrictive covenant is valid and enforceable depends on the reasonableness of its terms, which is a question of law for the court to determine. *Tarr v. Stearman*, 264 Ill. 110, 118-19 (1914); *Lanzit v. J.W. Sefton Manufacturing Co.*, 184 Ill. 326, 330 (1900); see *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1051 (1985); *Image Supplies, Inc. v. Hilmert*, 71 Ill. App. 3d 710, 712 (1979). Accordingly, our review is *de novo*. *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998).

A. Prohibition of *All* Physician Restrictive Covenants

Plaintiffs ask this court to hold that all physician restrictive covenants are void in Illinois as against public policy. Of course, physicians enjoy the freedom of contract. Slip op. at 9. However, these agreements are not immune from state regulation.

> "It is too well settled to require discussion at this day that the police power of the States extends to the regulation of certain trades and callings, particularly those which closely concern the public health. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." *Watson v. Maryland*, 218 U.S. 173, 176, 54 L. Ed. 987, 989, 30 S. Ct. 644, 646 (1910).

-25-

It is elementary that "a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all professions concerned with health." *Barsky v. Board of Regents of the University of the State of New York*, 347 U.S. 442, 449, 98 L. Ed. 829, 838, 74 S. Ct. 650, 654 (1954). The state's police power in the area of health is broad and "is sufficient to justify, in proper circumstances, uncompensated deprivation of personal liberty as well as deprivation of property. [Citation.] The States have wide regulatory power with respect to the practice of health care professions." *Methodist Medical Center of Illinois v. Ingram*, 82 Ill. 2d 511, 522-23 (1980) (and cases cited therein).

In support of this contention, plaintiffs present several considerations relating to patient care. However, instead of discussing the impact of physician restrictive covenants on the essential issue of health care, my colleagues in the majority curtly recite plaintiffs' patient-care considerations and unduly discount them simply as a "laundry list." Slip op. at 9. Indeed, without any discussion of plaintiffs' patient-care considerations, the court ultimately concludes that plaintiffs have not "shown that these covenants are manifestly injurious to the public welfare." Slip op. at 12. I respectfully disagree.

Based on the essential nature of health care in our society, I request the patience of my colleagues in the majority, as I look beyond what they characterize as a "laundry list" to more fully discuss the crucial relation between physician restrictive covenants and patient care. I am of the opinion that a strong case exists for abolishing all physician restrictive covenants as being against public policy. However, I agree that this decision is for the General Assembly to make.

The enforcement of physician restrictive covenants impedes the delivery of quality medical care in several ways. The essential ingredients of quality medical primary care include continuity of care, interpersonal communications, longitudinality of the physician-patient relationship, patients' preference to see their regular physician, and the accumulation of physician knowledge about the patient. When physician restrictive covenants are enforced, they ultimately result in the severing of physician-patient relationships. Studies have addressed

the involuntary termination of those relationships and the concomitant impact of forced discontinuity of care. These studies reveal that the disruption caused by enforcing physician restrictive covenants results in increased costs of care, decreased quality of care, and decreased patient satisfaction. A. Di Dio, *The Legal Implications of Noncompetition Agreements in Physician Contracts*, 20 J. Legal Med. 457, 475 (1999).

As a result of the forced severing of the physician-patient relationship due to the enforcement of a physician restrictive covenant, the patient must search for a new physician to tend to the patient's medical needs. Of course, this new physician must now learn about the patient to provide effective treatment. Physicians who know less about their patients will more likely order laboratory tests. In turn, decreased patient comfort levels with new physicians impede interpersonal communications and the new physicians' accumulation of knowledge. For patients who see multiple physicians for multiple medical problems, coordination of care is paramount. When these patients are compelled to change physicians, coordination of care decreases. Forced discontinuity of patient care results in: more frequent physician visits, laboratory tests, hospitalizations, and surgical procedures; increased utilization of speciality services and hospital emergency rooms; and increased emergency hospital admissions and longer hospital stays. 20 J. Legal Med. at 475-76. All of this results in increased health-care costs and decreased patient satisfaction.

Further, the enforcement of physician restrictive covenants "is contrary to medical research that demonstrates that continuity in the doctor-patient relationship fosters the delivery of quality health care and that the involuntary termination of this relationship may have lasting, negative effects on patients." 45 Rutgers L. Rev. at 31. Long-term, continuous relationships between physicians and patients impact positively on many aspects of health care. A longstanding, trusting physician-patient relationship often improves a physician's diagnostic abilities and increases the likelihood that the patient will comply with prescribed therapy. Providing continuity is particularly important to the treatment of certain patients such as children and the elderly, and for certain medical conditions such as psychiatric disorders. Patients having such relationships with primary-care physicians are less likely to seek treatment in hospital emergency rooms than patients who have

no such relationship. Also, patients who have ongoing relationships with their physicians have considerably shorter hospitalizations and intensive-care unit stays than patients who lack such relationships. 45 Rutgers L. Rev. at 31-34.

Further, it cannot be ignored that this country suffers from a shortage of primary-care physicians, which is obviously an additional threat to a patient's receiving adequate health care. Some communities are truly endangered by the shortage of available physicians caused by the enforcement of physician restrictive covenants. 41 Wake Forest L. Rev. at 212-13.

The enforcement of physician restrictive covenants harms not only patients. "While forced discontinuity of care may have detrimental effects for the patient when it occurs because of a restrictive covenant, it is equally troublesome for the physician." 41 Wake Forest L. Rev. at 207. The enforcement of physician restrictive covenants deny patients the right to choose their own physicians. This patient care consideration implicates a physician's ethical obligations.

In 1933, the American Medical Association (AMA) first addressed the issue of physician restrictive covenants. The AMA declared that contractual provisions that prevented the free choice of a physician were unethical. However, in 1960, the AMA Judicial Council, which is responsible for interpreting and recommending changes to the AMA constitution, bylaws, and ethical principles (45 Rutgers L. Rev. at 6 n.23), retreated from this position. The 1960 opinion stated that there was no ethical proscription against a reasonable restrictive covenant, if knowingly made and understood. In 1971, the AMA adopted a resolution that echoed the position of the 1960 opinion. 45 Rutgers L. Rev. at 6-7.

Subsequent to 1960, official statements of the AMA have repeatedly criticized physician restrictive covenants as being antagonistic to quality health care, yet have expressed toleration of reasonable noncompetition agreements. In 1971, the Judicial Council recommended barring physician restrictive covenants in all but exceptional circumstances. The Council explained that it

> "recognizes social and professional conditions have changed over the years. While there may once have been some need for restrictive covenants in agreements between physicians, the Council believes that existing socio-economic

-28-

conditions leave little or no justification for restrictive covenant arrangements. In the opinion of the Council, the use of restrictive covenants in an agreement between or among physicians should be entered into only under the most unusual circumstances and then only after those circumstances have been found by the local medical society to require the adoption of such a provision in order to protect the public and the profession in the particular situation." 45 Rutgers L. Rev. at 8, citing AMA, Proceedings of the House of Delegates, Report of Judicial Council 124 (1972).

The Judicial Council has also opined:

" 'Free choice of physicians is the right of every individual. One may select and change, at will, one's physicians, or may chose a medical care plan such as that provided by a closed panel or group practice or health maintenance or service organization. The individual's freedom to select a preferred system of health care and free competition among physicians and alternative systems of care are prerequisites of ethical practice and optimal patient care.' " 31 J.L. Med. & Ethics at 286, quoting AMA Council on Ethical and Judicial Affairs, Op. E–9.06 (1977).

In 1980, the AMA declared that physician restrictive covenants, while not unethical, are not "in the public interest." 45 Rutgers L. Rev. at 9.

Further, in 1993, the Judicial Council recognized the consensual and highly personal nature of the physician-patient relationship.

" 'The patient has the right to continuity of health care. The physician has an obligation to cooperate in the coordination of medically indicated care with other health care providers treating the patient. The physician may not discontinue treatment of a patient as long as further treatment is medically indicated, without giving the patient reasonable assistance and sufficient opportunity to make alternative arrangements for care.' " 31 J.L. Med. & Ethics at 286, quoting AMA Council on Ethical and Judicial Affairs, Op. E–10.01 (1993).

The AMA continues to be concerned with continuity of patient care and its disruption by enforcement of physician restrictive covenants.

The Judicial Council's current opinion on physician restrictive covenants states:

> " 'Covenants not to compete restrict competition, disrupt continuity of care, and potentially deprive the public of medical services. The Council on Ethical and Judicial Affairs discourages any agreement which restricts the right of a physician to practice medicine for a specified period of time or in a specified area upon termination of an employment, partnership or corporate agreement. Restrictive covenants are unethical if they are excessive in geographic scope or duration in the circumstances presented, or if they fail to make reasonable accommodation of patients' choice of physician.' " 31 J.L. Med. & Ethics at 287, quoting AMA Council on Ethical and Judicial Affairs, Op. E–9.02 (1998).

Although the AMA currently accepts reasonable physician restrictive covenants, the AMA remains critical of them.

These AMA-recognized ethical obligations of physicians, as they relate to patients' freedom of choice, do not result in a virtual involuntary servitude for physicians. After all, a physician may voluntarily retire or move from a community. However, the AMA has recently spoken "directly to physicians' higher obligations to patients versus themselves or other groups:

> " 'The practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and alleviate suffering. The relationship between patient and physician is based on trust and gives rise to physicians' ethical obligations to place patients' welfare above their own self-interest and above obligations to other groups, and to advocate for their patients' welfare.' " 31 J.L. Med. & Ethics at 286-87, quoting AMA Council on Ethical and Judicial Affairs, Report 1–A–01 (2001).

To state the obvious: the physician-patient relationship is unlike most other business relationships. Therefore, it should not be treated in an identical manner. See, *e.g.*, *York*, 222 Ill. 2d at 185-201 (recognizing uniqueness of physician-patient relationship, court treated element of reliance in apparent agency analysis differently in health-care context than in other contexts). When a physician must terminate his or her

relationship with a patient, the patient may suffer the consequences physically. In most other cases, the client who is denied the services of the professional is harmed only financially. 41 Wake Forest L. Rev. at 208.

The antagonism between physician restrictive covenants and the ethical obligations of physicians is recognized:

> "[AMA] Official Guidelines state that once a physician-patient relationship is formed, the physician has a legal and ethical duty to continue providing care as long as the patient needs it. When a physician must terminate the patient relationship due to a restrictive covenant, she must simultaneously fulfill this ethical obligation. Doing so requires that the physician give reasonable notice of termination, as well as sufficient opportunity to find an alternative provider. The AMA provides steps that a physician should follow in terminating the relationship, including providing the patient with a reason for terminating the relationship, continuing to provide treatment while the patient attempts to locate a new provider, recommending a new provider at the patient's request, and transferring the patient's files to another physician only with the patient's permission. Many physicians are prohibited from contacting their former patients under restrictive covenants and are therefore unable to fulfill these legal and ethical obligations." 41 Wake Forest L. Rev. at 207-08.

Physicians have an ethical duty to put the welfare of their patients above their own. A physician restrictive covenant undermines those ethics when it places the employers' financial interests above patients' interests. 41 Wake Forest L. Rev. at 208.

Rather than discuss the patient-care considerations as they relate to physician restrictive covenants, the court offers its own justification for such agreements: "Restrictive covenants protect the business interests of established physicians and, in this way, encourage them to take on younger, inexperienced doctors." Slip op. at 12-13. However: "No empirical evidence exists that restrictive covenants are needed to protect physician/employers' economic interests. Indeed, one medical commentator has concluded that these provisions are usually not economically justified. Richard P. Bergen, *Practical Considerations on Restrictive Covenants*, 203 JAMA 197, 198 (1968)." 45 Rutgers

L. Rev. at 31 n.137. Another commentator recently opined that, ordinarily, the revenue generated by the physician-employee should substantially exceed the cost to the employer of employing the physician. Thus, the employer is usually well compensated for the benefits it provides to the physician during the employment. Arguably the employer also profits from the long-term benefits provided to the physician. "As the physician gains knowledge, and enhances his or her personal reputation, the employer benefits by association. Those benefits do not just disappear when the physician departs; the community may continue to associate positive experiences or outcomes with the employer, and, hence, the value of the employer's goodwill remains enhanced." 31 J.L. Med. & Ethics at 190.

Notwithstanding the above, I am not unsympathetic to the legitimate business interests that employers such as defendants wish to protect. I note, however, that other means exist to protect these interests, which do not negatively impact or unduly burden patient care or the ethical obligations of physicians. For example, many physician restrictive covenants give the contracting physician the option of paying liquidated damages in the alternative to abiding by the activity, geographic, and temporal restrictions of the covenant. Some commentators argue that these damages are less harmful to physicians and the physician-patient relationship than the enforcement of the restrictive covenant through injunctive relief. 41 Wake Forest L. Rev. at 219. Moreover, the solitary suggestion that my colleagues in the majority offer to justify physician restrictive covenants focuses on "business interests" and lacks any consideration of physicians' ethical obligations to patients.

A strong case exists for a blanket abolition of all physician restrictive covenants in Illinois as being void against public policy. However, I agree that such a decision is properly left to the General Assembly. Slip op. at 13.

In the exercise of the police power, the State has the right to regulate any and all occupations for the protection of the lives and health of the people. All measures and regulations for the public health that do not infringe upon constitutional rights are within the scope of the police power. Within constitutional limitations, the General Assembly is the sole judge of what laws shall be enacted for the protection of the public health, and so long as such laws do not invade

inherent or constitutional rights, the determination of the General Assembly is conclusive. *People v. Witte*, 315 Ill. 282, 285 (1924); *People v. Kane*, 288 Ill. 235, 237-38 (1919).

Despite the long-established recognition that measures regulating health-care professionals must ultimately issue from the General Assembly, plaintiffs contend that this court should prohibit physician restrictive covenants in Illinois for the same reasons that this court prohibited attorney restrictive covenants in this state. In *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460 (1998), this court held that attorney restrictive covenants were void as against the public policy underlying Rule 5.6(a) of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 5.6(a)). The rule provides that a lawyer shall not participate in offering or making a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship. 134 Ill. 2d R. 5.6(a). This court observed that Rule 5.6(a) "is designed both to afford clients greater freedom in choosing counsel and to protect lawyers from onerous conditions that would unduly limit their mobility." *Dowd*, 181 Ill. 2d at 481. Plaintiffs argue that physician restrictive covenants, like attorney restrictive covenants, limit both patients' freedom in choosing physicians and physicians' professional autonomy.

This comparison fails for at least two reasons. First, *Dowd* implicated this court's unique and inherent responsibility for regulating the conduct of attorneys. This court has the sole and inherent power to define and regulate the practice of law in this state. Further, the power to prescribe rules governing attorney conduct rests solely in this court. Consistent with this exclusive power, this court has adopted the Rules of Professional Conduct (134 Ill. 2d Rules, art. VIII). These rules regulate the practice of law and the conduct of lawyers, and are intended to safeguard the public and assure the integrity of our legal system. These regulatory provisions assure that lawyers practice law ethically and with competence. *Ford Motor Credit Co. v. Sperry*, 214 Ill. 2d 371, 382-83 (2005); *People ex rel. Brazen v. Finley*, 119 Ill. 2d 485, 492-94 (1988). However, the legislature may enact statutes that are in aid of, and do not supersede or detract from, the power of this court to control the practice of law. *People ex rel. Chicago Bar Ass'n v. Goodman*, 366 Ill. 346, 349

(1937); see, *e.g.*, 705 ILCS 205/0.01 *et seq.* (West 2004) (Attorney Act).

In contrast, regulations governing physicians do not contain any restrictions similar to Rule 5.6(a) of the Illinois Rules of Professional Conduct. Neither Illinois statutes, nor the regulations of the Illinois Department of Professional Regulation, in any way prohibit physician restrictive covenants. See *Karlin v. Weinberg*, 77 N.J. 408, 420-21, 390 A.2d 1161, 1167-68 (1978) (applying this reasoning to New Jersey law). I "recognize that several commentators have criticized the distinction our law makes between physicians and attorneys in respect of restrictive covenants." *Community Hospital Group, Inc. v. More*, 183 N.J. 36, 55-56, 869 A.2d 884, 895-96 (2005) (collecting commentary). Despite this criticism, I nevertheless rely on this court's power to govern the ethical standards of the legal profession as justification for treating attorneys and physicians differently. See *Community Hospital Group*, 183 N.J. at 56, 869 A.2d at 896 (applying New Jersey law); *Intermountain Eye & Laser Centers, P.L.L.C. v. Miller*, 142 Idaho 218, ___, 127 P.3d 121, 132 (2005) (applying Idaho law).

Second, the attorney-client relationship differs markedly from the physician-patient relationship. Technology has enabled attorneys to establish and maintain professional relationships with their clients through, *e.g.*, conference calls and faxes. In contrast, the physician-patient relationship is highly personal, and necessarily requires face-to-face contact between physicians and patients. The unique and highly personal nature of the physician-patient relationship cautions this court to defer consideration of a blanket prohibition of physician restrictive covenants to the legislature.

The General Assembly possesses wide regulatory power with respect to the health-care professions and, further, it is within the broad discretion of the legislature to determine not only what the public interest and welfare require, but also to determine the measures needed to secure such interest. *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 40-41 (2001), quoting *Chicago National League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 364 (1985). Indeed:

> "The primary expression of Illinois public and social policy should emanate from the legislature. This is especially true regarding issues like the present one, where there is

disagreement on whether a new rule is warranted. The members of our General Assembly, elected to their offices by the citizenry of this State, are best able to determine whether a change in the law is desirable and workable.

*** The General Assembly, by its very nature, has a superior ability to gather and synthesize data pertinent to the issue. It is free to solicit information and advice from the many public and private organizations that may be impacted. Moreover, it is the only entity with the power to weigh and properly balance the many competing societal, economic, and policy considerations involved." *Charles v. Seigfried*, 165 Ill. 2d 482, 493 (1995).

I urge the General Assembly to consider the efficacy of physician restrictive covenants, and I recommend that the legislature prohibit such noncompetition agreements between physicians.

B. Reasonableness of *These* Physician Restrictive Covenants

This court properly holds that a blanket prohibition of all physician restrictive covenants should emanate from the legislature. However, my colleagues in the majority hold that the restrictive covenants presented in this case are reasonable. I cannot agree. The court improperly relies on a general analysis that ignores the unique nature of the physician-patient relationship.

The general analysis is as follows. Courts usually hold that contracts in total restraint of trade are illegal and void. *Bauer v. Sawyer*, 8 Ill. 2d 351, 354-55 (1956); *Hursen v. Gavin*, 162 Ill. 377, 379-80 (1896). However, the validity of a partial restraint of trade, *e.g.*, a noncompetition agreement, is determined by its reasonableness in terms of its effect on the parties and the public. Under the rule of reason, a noncompetition agreement is reasonable and, therefore, enforceable, if it: (1) is no broader than necessary to protect a legitimate interest of the employer; (2) does not unduly burden the employee; and (3) does not harm the public. *House of Vision, Inc. v. Hiyane*, 37 Ill. 2d 32, 37 (1967); *Bauer*, 8 Ill. 2d at 355; Restatement (Second) of Contracts §188 (1981). In relation to the employer's interest, the restraint must be reasonable as to activity, geographic area, and time. *Hursen*, 162 Ill. at 380-82; Restatement (Second) of Contracts §188, Comment *d*, at 43 (1981).

However, in my view, when a restrictive covenant deals with physicians, our traditional analysis should be applied in a manner which explicitly and specifically references the injury to the public in terms of patient care. Other states have so recognized. For example, in *Statesville Medical Group v. Dickey*, 106 N.C. App. 669, 673, 418 S.E.2d 256, 259 (1992), the court referenced the injury to the public as follows:

> "To determine the risk of substantial harm to the public this Court has considered the following factors: the shortage of specialists in the field in the restricted area, the impact of plaintiff establishing a monopoly *** in the area, including the impact on fees in the future and the availability of a doctor at all times for emergencies, and the public interest in having a choice in the selection of a physician."

Accord *Valley Medical Specialists v. Farber*, 194 Ariz. 363, 371, 982 P.2d 1277, 1285 (1999) (concluding that patients' right to see the physician of their choice is entitled to substantial protection); *Community Hospital Group*, 183 N.J. at 60, 869 A.2d at 898, quoting *Karlin*, 77 N.J. at 424, 390 A.2d at 1169-70 (holding that court must evaluate several factors, including extent to which enforcing restrictive covenant would foreclose patients from seeing the departing physician if they desired to do so); *Intermountain Eye*, 142 Idaho at ___, 127 P.3d at 132 ("We adopt the view expressed by the supreme courts of Arizona and New Jersey"). Such realistic consideration of patient care recognizes human dignity and the importance of health care, rather than viewing human beings as a commodity to be considered only in the context of the employer and the employee.

I observe that I am not suggesting a departure from our traditional common law analysis of restrictive covenants with its identified elements. Rather, in agreement with the above-cited enlightened courts, I consider patient care to be included in, or a subset of, the element of public harm. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147 (2006), is a recent example of this court recognizing the uniqueness of the physician-patient relationship in the context of another general analysis. *York* involved a medical malpractice action claiming that a hospital was vicariously liable for the negligence of an independent-contractor physician under the doctrine of apparent agency. This court unanimously held that, in the

-36-

context of health care, it would treat the element of reliance in the apparent agency analysis differently than in other contexts. The court explained that the relationship between a patient and health-care providers "presents a matrix of unique interactions that finds no ready parallel to other relationships." *York*, 222 Ill. 2d at 192. In the present case, I am disappointed that my colleagues in the majority fail to consider the uniqueness of physician restrictive covenants, as they recently did in *York*, but rather, treat all restrictive covenants alike.

One might assume that this court would give particularized treatment to physician restrictive covenants in light of the unique considerations they present. Unfortunately, the majority of courts, including this court, currently view the physician-patient relationship as analogous to a simple merchant-customer relationship, thus comparing a very complex relationship to a relationship that is more routine. These courts do not analyze physician restrictive covenants any differently than they analyze covenants-not-to-compete between commercial parties. 41 Wake Forest L. Rev. at 192; accord 45 Rutgers L. Rev. at 4 ("Courts do not analyze noncompetition agreements between physicians any differently than comparable provisions between commercial parties").

The court today concludes that the general analysis applicable to all commercial restrictive covenants so completely takes into account patient-care considerations and the ethical obligations of physicians to patients that the court sees no difference in the two contexts. Slip op. at 11. I respectfully disagree. A profound "disconnection" exists between the prevailing physician restrictive covenant analysis and patient care.

In applying the prevailing analysis to determine the reasonableness of a physician restrictive covenant, this court has held that "the interest of the public is in having adequate medical protection." *Bauer*, 8 Ill. 2d at 355. In *Bauer*, for example, this court reasoned that the reduction by one of 70 physicians serving a community would not "cause such injury to the public" as to justify refusing to enforce the restrictive covenant. *Bauer*, 8 Ill. 2d at 355. This dated view of the public interest promotes the attitude that patients are widgets–nondescript objects that anyone has the right to service. Absent is any consideration of what effect enforcing the restrictive

covenant would have on the interests of third parties, *i.e.*, patient care or the ethical obligations of physicians.

Further, this court has even misapplied this flawed numerical test. In a case where the physician argued that a scarcity of physicians would affect the public interest, this court reasoned:

> "Nor is the contract injurious to any legitimate interest of the public. Defendant can be as useful to the public at some other place in the State as he can in Rockford, and the health of persons elsewhere is just as important. It cannot be said that the public interest is adversely affected if a physician decides to move from one community to another, nor does it become so if the move results from some agreement made in advance. If a severe shortage exists in any particular place young doctors will tend to move there, thus alleviating the shortage."
> *Canfield v. Spear*, 44 Ill. 2d 49, 52 (1969).

Accord *Bauer*, 8 Ill. 2d at 355 ("In any case, there is no reason why Dr. Sawyer cannot serve the public interest equally well by practicing in another community"); 358 Ill. App. 3d at 909 (applying this reasoning in the present case).

*Canfield*, decided nearly 40 years ago, was the last time this court was presented with determining the reasonableness of a physician restrictive covenant (as opposed to a noncompetition agreement between veterinarians, *Cockerill v. Wilson*, 51 Ill. 2d 179 (1972)). Commentators have long condemned the above-quoted reasoning. First, it completely ignores the interests of patients who lose their physician due to enforcement of the restrictive covenant. Those patients "will presumably find little comfort in knowing that patients in some other area can now benefit from their doctor's services." 45 Rutgers L. Rev. at 30 n.136 (describing this analysis as "peculiar"). Second, "the notion that the benefit of adding a new doctor to a to-be-announced location equals the cost to incumbent patients caused by losing their doctor is ridiculous. The incumbent patients suffer in the short term a great deal more than the potential new patients gain." 41 Wake Forest L. Rev. at 203-04; see Restatement (Second) of Contracts §188, Illustration 14, at 48 (1981) (focusing analysis on shortage of doctors *in the affected area*). Indeed, in examining the temporal restrictions in these physician restrictive covenants, my colleagues in the majority observe: "The measure of the potential

harm to the public caused by the restriction is whether there exists a sufficient number of cardiologists *in the area* to meet patient needs." (Emphasis in original.) Slip op. at 20. Based on the current recognition of patient-care considerations and ethical obligations of physicians, I am disappointed that this court does not take the opportunity this case presents to expressly repudiate the flawed reasoning expressed in *Canfield*.

Applying my proposed physician restrictive covenant analysis to the present case, I conclude that the record contains insufficient evidence to determine whether enforcement of these restrictive covenants is injurious to the public. To be sure, the record does not indicate a scarcity of physicians within the two-mile and five-mile geographic areas affected by the covenants. Further, the restricted hospitals in the geographic area are St. Mary of Nazareth Hospital, Norwegian American Hospital, St. Elizabeth Hospital, and Sacred Heart Hospital. The record contains evidence that there were more than a sufficient number of qualified cardiologists ready and willing to take care of plaintiffs' patients. For example, Norwegian American Hospital has five cardiologists serving a maximum of 100 patients, when only two or three cardiologists are necessary for a hospital of that size.

However, and more importantly, the record contains insufficient evidence regarding the level of hardship that enforcement of these physician restrictive covenants would impose on plaintiffs' incumbent patients, if they wished to maintain their relationships with plaintiffs. For example, plaintiffs' employer argued that there was "no basis in the record for an assumption that restrictive covenants among physicians will hinder patient care." In support, the employer asserted that plaintiffs "were quickly granted privileges at a number of hospitals in the immediate area, including Weiss Memorial Hospital, Lincoln Park Hospital, Gottlieb Hospital, Westlake Hospital, Lincoln Park Hospital [*sic*] and Illinois Masonic Hospital."

This argument misses the mark. The record does not disclose the addresses of these hospitals, or any evidence of the relative distances between these hospitals and those within the affected geographic areas. While this court could properly take judicial notice of the distances between locations (see, *e.g.*, *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177-78 (2003)), still absent would be evidence

of the hardship, if any, this data would impose on plaintiffs' incumbent patients.[7] Based on this lack of essential evidence of record, I would reverse the judgments below and remand the cause to the circuit court for additional fact finding.

## IV. CONCLUSION

For the foregoing reasons, I concur in part and dissent in part.

---

[7] If I were to take judicial notice of these relative distances, some would appear to demonstrate hardship to those of plaintiffs' incumbent patients who wish to maintain their relationship with plaintiffs. For example, if one of plaintiffs' patients received hospital services at Sacred Heart Hospital, located at 3240 W. Franklin Boulevard in Chicago, through a Health Maintenance Organization (HMO) or a Paid Provider Organization (PPO), that patient would have to travel approximately eight miles to see either plaintiff at Louis A. Weiss Memorial Hospital, located at 4646 N. Marine Drive. That same patient would have to travel approximately 11 miles to see either plaintiff at Gottlieb Memorial Hospital, located at 701 W. North Avenue, in Melrose Park, a suburb of Chicago. Of course, this assumes that either Weiss or Gottlieb were a recognized provider under the patient's health insurer or HMO.