NO. 4-01-0005

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

PRAIRIE EYE CENTER, LTD., a ) Appeal from

Professiona
l Service Corporation, ) Circuit Court of

f/k/a CENTRUM EYE
 CENTER, LTD., ) Sangamon County

Plaintiff-Appellee, ) No. 99MR0013

v. ) 

PATRICK J. BUTLER, M.D.,           ) Honorable

Defendant-Appellant. ) Dennis L. Schwartz,

) Judge Presiding.

_______________________________________________________________

JUSTICE KNECHT delivered the opinion of the court:

Defendant, Patrick Butler, M.D., appeals a judgment order finding a noncompetition agreement in his contract with plaintiff, Prairie Eye Center, Ltd. (Prairie), was valid and enforceable.  He also appeals from the entry of a permanent injunction prohibiting him from competing with plaintiff, $1,654,700 damages award to plaintiff, and $164,432.34 attorney- fees award due to his intentional and repeated violations of the covenant not to compete.  Defendant argues (1) a covenant not to compete among physicians is unenforceable on public policy grounds; (2) Prairie did not have a sufficient protectible interest in the patients Butler brought with him from his practice prior to being employed by Prairie to justify enforcing the noncompetition agreement as to those patients; (3) lost profits awarded to Prairie were inherently speculative and predicated upon assumptions not supported by sufficient evidence; and (4) Prairie was improperly provided with both monetary damages and injunctive relief.  We affirm.

I. BACKGROUND

Butler is an ophthalmologist who specializes in the treatment of glaucoma.  Prairie is a professional service corporation made up of ophthalmologists and optometrists practicing in Springfield and in surrounding communities.  Butler came to Springfield in 1994 and began a clinical practice at the Southern Illinois University School of Medicine (SIU).  While at SIU, Butler practiced with other physicians, including Dr. Robert Posegate and optometrist Larry Williams.  Posegate became a personal as well as professional friend of Butler.  

In February 1997, Butler entered an employment agreement with Centrum Eye Center, Ltd., which was solely owned by Dr. Sandra Yeh.  Later that year, Centrum Eye Center changed its name to Prairie Eye Center and the parties executed a second identical agreement.  Butler began his employment with Prairie in July 1997.  

The employment agreement between Butler and Prairie contains the following covenant not to compete:

"Upon the expiration or termination of this Agreement, employee covenants that he will not, for a period of two (2) years after expiration or termination, engage in, be associated with or have a financial interest in any medical practice or ophthalmology practice, either directly or indirectly, as employer, employee, principal agent, independent contractor, consultant, partner, stockholder, creditor in an other capacity, at any location(s) within Sangamon County, Illinois[,] or within ten (10) miles of Hillsboro, Illinois[,] and ten (10) miles of any branch office of Employer.  Employee agrees that upon his breach or violation of the foregoing provisions of this paragraph, employer shall be entitled, as a matter of right, to obtain relief in any court of competent jurisdiction enjoining such breach or violations, and recover from Employee all its attorneys' fees in addition to all other remedies provided at law, in equity or under this Agreement.  Employee acknowledges that employer has a valid, protectible interest in its medical and ophthalmology practice, and that the duration and geographic scope of this covenant are reasonable to protect that interest ***.  In the event any violation hereunder is determined, the period of noncompetition shall be extended by a period of time equal to that period beginning when such violation commenced and ending when the activities constituting such violation shall have terminated."

On December 1, 1998, Yeh heard Posegate, who was leaving SIU to establish a private medical practice in Springfield with Williams, had been telling others in the Springfield medical community that Butler would be joining his practice in the near future.  The next day, December 2, Yeh held a meeting with Butler to discuss his performance evaluation and his contractually provided for buy-in to Prairie.  Butler told her he had no plans to leave Prairie.  Yeh told Butler she would have her attorney draw up a confidentiality agreement and have a valuation of the practice prepared.

On December 9, Butler's attorney hand-delivered a letter to Yeh informing her Butler was terminating his employment with Prairie effective February 12, 1999.  

On January 6, 1999, Posegate and Williams opened an office in Springfield approximately two miles from
 Prairie.  They called their practice Sangamon Eye Associates (Sangamon).  On January 12, Butler started telling his patients at Prairie he would be leaving and they should call Sangamon to make follow-up appointments with him.  Butler also had business cards printed by that time indicating he would have office space at the same address as Sangamon and including his telephone number, also the same as that of Sangamon.  

On January 12, Prairie filed the instant complaint in the circuit court seeking declaratory relief, permanent injunctive relief, and preliminary injunctive relief.    

Two days later, the trial court entered an order granting a preliminary injunction in favor of Prairie except as to patients who had a preexisting professional relationship with defendant, 
i.e.
, had been his patients at SIU.  The trial court relied on 
Dowd & Dowd, Ltd. v. Gleason
, 181 Ill. 2d 460, 481, 693 N.E.2d 358, 369 (1998), in which the Supreme Court of Illinois held a covenant not to compete unenforceable between a law firm and two departing attorneys.  In February, after additional briefing and affidavits from both parties, the trial court reaffirmed its January order.  Prairie appealed and this court reversed with directions to the trial court to enter a preliminary injunction enforcing the covenant in its entirety.  
Prairie Eye Center, Ltd. v. Butler
, 305 Ill. App. 3d 442, 713 N.E.2d 610 (1999), 
appeal
 
denied
, 185 Ill. 2d 665, 720 N.E.2d 1105 (1999) (hereinafter 
Prairie
).  On June 11, 1999, the mandate of this court issued.

  The trial court then issued a modified preliminary injunction on July 14 enjoining Butler from: 

"engaging in:  

1) the practice of medicine and/or ophthalmology at any location within Sangamon county or within ten miles of [Prairie's] branch offices in Springfield, Hillsboro, Girard, Rushville, Beardstown, Lincoln[,] and Decatur, Illinois;

2) engaging in, associating with, or having a financial interest in any medical practice or ophthalmological practice, either directly or indirectly, as employer, employee, principal, agent, independent contractor, consultant, partner, stockholder, creditor, or in any other capacity at any location within Sangamon County, Illinois[,] or within 10 miles of [Prairie's] branch offices in Springfield, Hillsboro, Girard, Rushville, Beardstown, Lincoln[,] and Decatur, Illinois;

3) this preliminary injunction shall be in effect until further order of this [c]ourt."

On June 16, 1999, five days after the decision in Prairie, Butler filed an answer, affirmative defenses, and a counterclaim against Prairie.  He alleged Prairie breached the employment agreement and he was entitled to rescission.  While the original preliminary injunction was being appealed, Butler was found in contempt of court for soliciting patients of Prairie with whom he had had no prior contact, 
i.e.
, not former SIU patients.  On March 16, 2000, Prairie filed another motion to find Butler in contempt and for sanctions.  The trial court, after granting Prairie's motion to show cause, combined the hearing with the trial set for October 10, 2000. 

The trial of this matter was lengthy and included the following evidence.     

Following the entry of the original preliminary injunction, Butler began practicing at the offices of Sangamon in Springfield as well as at the offices of Dr. Bourn in Jacksonville and at the offices of Family Eye Care in Litchfield.  After the entry of the modified preliminary injunction order, Butler stopped practicing at the offices of Sangamon and opened an office in Athens.  To open this office, Butler borrowed money from Sangamon without signing a note or setting up any agreed-upon method of repayment.  He was also able to obtain the use of extra ophthalmologic equipment from Sangamon and referred his patients to the facilities of Sangamon for tests for which he did not possess the necessary equipment.

Shortly after Sangamon opened its office in January 1999, it erected a sign in front of its building with the name Sangamon and below it a listing of the practitioners practicing within and a telephone number for the office.  The list began with Butler's name.  Nothing differentiated Butler from the others practicing in the offices of Sangamon.  The names on the door also included Butler
 under the heading of Sangamon with nothing to indicate he was just sharing space with them and not associated with the enterprise.  Butler's ad in the Yellow Pages of the Springfield telephone directory was placed directly above that of Sangamon and was identical in design and included the telephone number of Sangamon as the number to call for appointments with Butler.  When Butler opened his office in Athens, he included Sangamon's telephone number on the window to call for appointments with him.  These signs remained the same throughout the dates of trial in this case in October and November 2000.   Prior to and immediately upon leaving Prairie's employ, Butler erected large signs on the property adjoining Prairie's offices detailing where he could be located for appointments.  He also handed out his business card with the address of Sangamon for the use of patients in scheduling follow-up appointments while he was still seeing them at Prairie. 

Upon Butler's leaving Prairie and practicing in the offices of Sangamon, Prairie received over 400 requests for transferring patient records to Butler at Sangamon.  Many other requests were received for his later offices in Jacksonville, Litchfield, and Athens.  Many of these 
were
 
not
 patients Butler had seen at SIU.  

Sangamon handled Butler's billing up until the time of trial.  Employees of Sangamon helped staff Butler's Athens office and he received some help from them in Litchfield.  The office of Family Eye Care in Litchfield (whose main office was in Hillsboro directly competing with Prairie) was found to be within 10 miles of Hillsboro and Prairie's office there.  

Both Butler and Posegate testified loans were made to Butler from Sangamon to open his office in Athens with no documentary evidence of the loans.  Dale Dirks, a certified public accountant working for both Butler and Sangamon, testified that between the outright loans and the services provided, Butler owed Sangamon approximately $150,000.  He was working on setting up a formal loan agreement with interest rates, amounts owed, and a repayment period.  

The trial court entered a judgment order in this case on November 30, 2000.  The court entered two lengthy judgment orders containing specific findings of fact and then found the noncompetition agreement was valid and enforceable; Butler violated the agreement; Prairie was damaged by Butler's intentional and repeated violations; Butler should be enjoined from practicing medicine in the prohibited areas, including Litchfield; Butler failed to prove his affirmative defenses and counterclaim for rescission; Butler intentionally and repeatedly violated the modified preliminary injunction and was in contempt of court; and Prairie was entitled to attorney fees as provided by the agreement in the amount of $164,432.34; and awarded $554,000 damages for lost profits over a 20-month period and $1,100,000 for the diminished value of Prairie.  This appeal followed.

II. ANALYSIS

It is the province of the finder of fact to resolve conflicts in the evidence, pass upon the credibility of witnesses and decide the weight to be given to the witnesses' testimony.  A trial court's factual findings will be reversed only if they are against the manifest weight of the evidence.  
Wildman, Harrold, Allen & Dixon v. Gaylord
, 317 Ill. App. 3d 590, 597, 740 N.E.2d 501, 508 (2000).  Where an injunction is issued, unless the trial court abuses its discretion and holds contrary to the manifest weight of the evidence, an injunction will not be set aside on review.  
R.L. Polk & Co. v. Ryan
, 296 Ill. App. 3d 132, 142, 694 N.E.2d 1027, 1034 (1998). 

Butler contends first the noncompetition agreement in his employment contract with Prairie should not be enforced because a covenant not to compete among physicians is unenforceable on public policy grounds.  In support of this contention he cites 
Carter-Shields v. Alton Health Institute
, 317 Ill. App. 3d 260, 270-71, 739 N.E.2d 569, 577 (2000) (a case from the Fifth District decided after our decision in 
Prairie
 in which the trial court found a noncompetition agreement between a physician and a health-care institute to be an undue interference with the public's right to a physician of their choice and the enforcement of the provision to be an unreasonable restraint of trade), 
appeal
 
allowed
, 194 Ill. 2d 566, 747 N.E.2d 351 (2001).  In 
Carter-Shields
, the court first found the defendant was not a licensed hospital but was a health-care provider controlled by a partnership of which one member was a nonphysician and was barred by the corporate practice of medicine doctrine from entering into an employment agreement with the plaintiff physician; thus, the entire employment agreement was void and unenforceable.  
Carter-Shields
, 317 Ill. App. 3d at 267-68, 739 N.E.2d at 575.  

The court then went on to state that, had the employment agreement itself been enforceable, the noncompetition portion was an impermissible restraint of trade and unenforceable, relying on the public policy analysis found in 
Dowd
.  
Carter-Shields
, 317 Ill. App. 3d at 271-72, 739 N.E.2d at 578.  The 
Carter-Shields
 court acknowledged we had considered the public policy considerations relied upon in 
Dowd
 in our decision in 
Prairie
 and disagreed with our finding that freedom to contract is an equally important public policy consideration.  
Carter-Shields
, 317 Ill. App. 3d at 271-72, 739 N.E.2d at 578;  see 
Prairie
, 305 Ill. App. 3d at 449, 713 N.E.2d at 615.  The court, stating it was not bound to follow decisions from other appellate court districts, declined to follow 
Prairie
.  
Carter-Shields
, 317 Ill. App. 3d at 272, 739 N.E.2d at 578.

We, in turn, decline to follow 
Carter-Shields
.  In 
Dowd
, the court relied on Rule 5.6 of the Rules of Professional Conduct (134 Ill. 2d R. 5.6), which prohibits lawyers from participating in any employment agreement restricting the rights of lawyers to practice after termination of an employment agreement.  Finding the noncompetition agreement void and unenforceable, the court stated the rule was designed to further the public policy objective of affording clients freedom in choosing counsel as well as to protect lawyers from conditions unduly restricting their mobility.  
Dowd
, 181 Ill. 2d at 481, 693 N.E.2d at 369.

In 
Carter-Shields
, the court relied on section 9.2 of the Opinions of the Council on Ethical & Judicial Affairs of the American Medical Ass'n (1986), which states noncompetition agreements between physicians are discouraged as not in the public interest.  
Carter-Shields
, 317 Ill. App. 3d at 269, 739 N.E.2d at 576.  While Rule 5.6 and section 9.2 may share some of the same public policy concerns, they have different applicability when considered here.  

First, the wording of Rule 5.6 is mandatory while that in section 9.2 is advisory only.  Of more importance, Rule 5.6 is codified in the rules of the Illinois Supreme Court and has the force of law (
In re Vrdolyak
, 137 Ill. 2d 407, 422, 560 N.E.2d 840, 845 (1990)); also, it is indicative of public policy in the area of attorney conduct.  Section 9.2, on the other hand, is not codified in the State of Illinois; thus, it does not establish public policy.  See 
American Federation of State, County & Municipal Employees v. State of Illinois
, 124 Ill. 2d 246, 260, 529 N.E.2d 534, 540 (1988).

While there may be no real difference in the concerns of clients in keeping or choosing lawyers of their own choice and patients in keeping or choosing doctors of their own choice, a distinct difference lies in the legal underpinnings of 
Dowd
 and 
Carter-Shields
.  Despite our sympathy for the rights of patients to choose their own doctors, we are constrained to follow the long line of precedent (
Canfield v. Spear
, 44 Ill. 2d 49, 254 N.E.2d 433 (1969); 
Bauer v. Sawyer
, 8 Ill. 2d 351, 134 N.E.2d 329 (1956); 
Gillespie v. Carbondale & Marion Eye Centers, Ltd.
, 251 Ill. App. 3d 625, 622 N.E.2d 1267 (1993); 
Retina Services, Ltd. v. Garoon
, 182 Ill. App. 3d 851, 538 N.E.2d 651 (1989)) finding non-competition agreements enforceable in the medical profession.  We leave the public policy pronouncements for either our supreme court or the legislature.

Butler next argues that, even if noncompetition agreements are enforceable against physicians, this particular one is not due to the unique facts of this case.  Butler argues Prairie's protectible interest does not include the patients he treated and developed as his while at SIU prior to becoming employed by Prairie.  Prairie argues the contract under which Butler was hired contemplated the SIU patients becoming patients of Prairie and Butler was compensated on that basis.  Prairie contends this issue was decided in 
Prairie
 and has become the law of the case.

Prairie
 was dealing with the propriety of a preliminary injunction for which Prairie needed only to make a 
prima
 
facie
 showing of a protectible interest.  That is what this court found.  
Prairie
, 305 Ill. App. 3d at 445, 713 N.E.2d at 613.  This court's pronouncement of Prairie's protectible interest under those circumstances would be preliminary only subject to reconsideration upon review of the complete evidence presented to the trial court at trial on the permanent injunction.  Thus, it is not the law of the case.  However, in this instance, given  the applicable case law, the same result is reached either way.

Butler argues existing case law is inapplicable here because the interest sought to be protected is usually that of an established medical practice taking on a new doctor who enters without a patient base and gains one due to his association with the established practice while he entered his employment with Prairie with numerous patients already.  However, that is not always the case, as 
Bauer
 illustrates.  In 
Bauer
, a medical partnership was found to have a protectible business interest in the patients of the partnership when a founding partner (not a new doctor) left the partnership. 
Bauer
, 8 Ill. 2d at 356, 134 N.E.2d at 332.  

As noted in 
Prairie
, for many years the courts in Illinois have found medical practices have a protectible interest in the patients of their physicians and this interest is inferred from the nature of the profession.  See, 
e.g.
, 
Cockerill v. Wilson
, 51 Ill. 2d 179, 184, 281 N.E.2d 648, 651 (1972); 
Canfield
, 44 Ill. 2d 49, 254 N.E.2d 433; 
Sarah Bush Lincoln Health Center v. Perket
, 238 Ill. App. 3d 958, 963, 605 N.E.2d 613, 617 (1992)
. 

In spite of this history, Butler argues the court must find a "near[-]permanent relationship" exists between the medical practice and its patients in order to show a protectible interest, citing 
Danville Polyclinic, Ltd. v. Dethmers
, 260 Ill. App. 3d 108, 113, 631 N.E.2d 842, 846 (1994).  The holding in 
Danville
, however, was specific to the facts of that case.  In 
Danville
, the restrictive covenant was not intended to protect the clinic's interest in patients but to retain a sufficient number of partners to finance a new building; when no proof of a near-permanent relationship was offered, the covenant was not enforced.  
Danville
, 260 Ill. App. 3d at 113, 631 N.E.2d at 845-46.

The case law governing covenants not to compete in  medical employment contracts has developed separately from that applicable to other employment contracts and no special proof of entitlement to patients is required to find a protectible interest on the part of the medical practice.  

"The Illinois Supreme Court has repeatedly upheld covenants not to compete in medical practice cases without making a specific inquiry into whether the plaintiff has demonstrated a protect[i]ble business interest.  Notwithstanding the appellate court decisions which have carefully scrutinized whether the plaintiff has shown a protect[i]ble interest in cases outside the medical practice area, the Illinois [S]upreme [C]ourt's consistent enforcement of such covenants in the medical professional field, where the durational and geographic scope is reasonable, demonstrates

its recognition that a professional's medical practice is a protect[i]ble business interest."  
Retina Services, Ltd.
, 182 Ill. App. 3d at 856, 538 N.E.2d at 653.

Thus, Prairie need not present evidence of a protectible interest in Butler's former patients from SIU as these patients are precisely what Prairie negotiated for when it entered the employment agreement with Butler.  Had Butler wished to protect his right to those patients should he leave Prairie's employ, he could have negotiated that point.  

Butler next contends the lost-profit damages awarded to Prairie were inherently speculative and predicated on assumptions not supported by sufficient evidence.  Butler contends the evidence presented by Prairie's expert witness, Robert Wade, was too speculative because he based his opinion on assumptions Prairie would have retained 80% of the patients it lost when Butler left and illegally competed with it and Butler would not have been able to set up practice outside the restricted area immediately without the assistance of Sangamon. 

The amount of an award of damages for lost profits need not be proved with absolute certainty, but the evidence must show a loss with a reasonable degree of certainty and afford a reasonable basis for the calculation of damages.  
Midland Hotel Corp. v. Reuben H. Donnelley Corp.
, 118 Ill. 2d 306, 315-16, 515 N.E.2d 61, 66 (1987).  In the instance of the breach of a noncompetition covenant specifically, although it may be impossible to ascertain the exact amount of lost profits, an award of damages is not precluded.  The evidence must establish a basis for the assessment of damages with a fair degree of probability.  
Agrimerica, Inc. v. Mathes
, 199 Ill. App. 3d 435, 452, 557 N.E.2d 357, 369 (1990).       

Butler argues Wade's assertion Prairie would have retained 80% of its patients is not based on sufficient evidence because his testimony was premised solely on his experience in the ophthalmologic industry and did not have any statistical support.  He points to evidence from several ophthalmologists, testifying for both Prairie and for Butler, that glaucoma patients, Butler's specialty, were more loyal than the average ophthalmology patient and would tend to follow their physician if he were to relocate to a new office within a 50-mile radius of his previous location.  Butler also contends Wade based his estimate on a well-managed transition where the leaving physician would not encourage patients to leave but would actively encourage patients to stay, such as in the case of retirement.  Although Wade did use the language "well-managed transition," which included instances where the leaving physician was selling his practice, he also included instances where the leaving physician simply did not compete with the original practice.

Because Butler actively violated the restrictive covenant, there is no way of knowing precisely how many patients Prairie would have retained.  Hence, Butler has created some of the speculation of which he now complains regarding the percentage of patients Prairie would have retained after his departure.  His presence within the restricted area made it easier for his former patients to leave Prairie than if he had practiced solely outside the area.  

Butler also contends the evidence indicated he could have, and did, compete with Prairie outside the restricted area immediately and, hence, any loss of profits occurred legally.  However, the evidence showed Butler would not have been able to establish his offices outside of the restricted area so quickly without the help of Sangamon.  Sangamon provided "loans" as well as services to Butler both within and without the restricted area.

Butler argues the covenant does not preclude him and Sangamon from associating in the development of medical practices outside the restricted area.  He contends it only prevents him from associating with Sangamon to practice medicine within the restricted area.  He argues the association he had, if any, with Sangamon was for the purpose of assisting him and establishing practices outside the restricted area and such an association was not "at any location within" the restricted area. 

Sangamon's location within the restricted area meant Butler could not affiliate himself with Sangamon under the covenant.  Butler contends the evidence is not conclusive that he affiliated with Sangamon; he only shared its space and paid for services rendered.  However, the trial court heard the evidence in the case and assessed the credibility of the witnesses who testified before it as to whether there was an actual affiliation between Sangamon and Butler or arm's length dealings between the two.  There was certainly enough evidence to support a finding that Butler had associated himself with Sangamon to support the findings of the trial court.

In addition, the trial court found Butler's location and practice in Litchfield were within the restricted area and Sangamon provided help for Butler there.  There was also evidence of Butler's continued use of Sangamon's offices in Springfield and of his continuing to send patients there for tests.

Thus, the evidence presented by Wade of lost profits, while not mathematically conclusive, was sufficient to provide a reasonable basis for an award of damages for lost profits.  The trial court did not take Wade's figures at face value and reduced them by over $100,000 to coincide with the proper time period in which Butler had violated the covenant.

Finally, Butler contends it was error for the trial court to award both monetary damages and injunctive relief barring him from practicing medicine for an additional two-year term.  The trial court awarded Prairie not only $554,700 in lost-profit damages but also $1,100,000 representing the diminished value of Prairie's business.  Butler contends an injunction should not issue where monetary damages are adequate compensation for a plaintiff's injuries.  In support of his contention, he cites numerous cases holding a preliminary injunction should not issue where an adequate remedy at law will make a plaintiff whole after trial.  To find a legal remedy adequate, it must be clear and complete and must be just as effective as the sought-for injunction in achieving justice.  
Cullen Electric Co. v. Cullen
, 218 Ill. App. 3d 726, 734, 578 N.E.2d 1058, 1062-63 (1991); 
Levitt Homes, Inc. v. Old Farm Homeowners' Ass'n
, 111 Ill. App. 3d 300, 316, 444 N.E.2d 194, 204 (1982).

The decision to grant or deny injunctive relief lies in the trial court's sound discretion and its findings will not be disturbed absent an abuse of that discretion.  
R.L. Polk & Co.
, 296 Ill. App. 3d at 142, 694 N.E.2d at 1034.  
We find no abuse of that discretion.

The monetary damages awarded to Prairie are for damages incurred through the time of trial and do not extend beyond that time.  They are intended to put Prairie in the position it would have been in had the covenant not to compete not been violated by Butler.

The injunction is to enforce the covenant not to compete for which Prairie bargained and did not receive. The assessment of damages alone would not provide Prairie clear and complete justice, as that award only restored the parties to the position they would have been in had Butler not competed in violation of his agreement.  The injunction actually gives Prairie the agreed-upon period of noncompetition to get Butler's replacement ophthalmologist established and in a position to effectively compete with Butler, a known figure in the community.          Further, the language of the covenant provides that, upon its breach, "the period of noncompetition shall be extended by a period of time equal to that period beginning when such violation commenced and ending when the activities constituting such violation shall have terminated."  Thus, the agreement itself provides for an extension of the restriction upon proof of its breach.  In addition, the agreement provides Prairie is entitled to relief in court for such breach and to recovery not only of its attorney fees but, additionally, it is entitled to "all other remedies provided at law."  Thus, Butler agreed to pay damages if assessed 
as
 
well
 
as
 to an extension of the noncompetition period upon his breach of the agreement.  The trial court simply enforced the parties' agreement.

III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

COOK and STEIGMANN, JJ., concur.