NOTICE

Decision filed 04/18/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220732-U

NO. 5-22-0732

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| McNICHOLL COUNSELING, P.C., d/b/a The Rock Counseling Group, | ) ) ) | Appeal from the Circuit Court of Champaign County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) | No. 22-CH-43 |
| | ) | |
| MICHAEL JENKINS, | ) ) | Honorable Benjamin W. Dyer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's injunctive order enjoining defendant from providing mental health treatment services within a 50-mile radius of plaintiff's principal place of business is vacated where the restrictive covenant is unreasonable. The remaining prohibitions regarding solicitation under said agreement are affirmed.

¶ 2    Defendant, Michael Jenkins, appeals the circuit court's preliminary injunction order that prohibits him from providing mental health treatment for two years within a 50-mile radius from the Champaign, Illinois, office of plaintiff, McNicholl Counseling, P.C., d/b/a The Rock Counseling Group (TRCG), and further prohibits Jenkins from soliciting TRCG's employees and patients for two years. For the following reasons, we vacate the circuit court's order granting the injunction for the noncompetition clause that enjoined Jenkins from providing mental health treatment within a 50-mile radius of TRCG's Champaign, Illinois, office.

1

¶ 3                                   I. BACKGROUND

¶ 4     Jenkins was hired as a licensed social worker by TRCG on March 10, 2019. When hired, Jenkins executed a noncompetition and nonsolicitation agreement with TRCG as a supplement to the TRCG employment agreement. The noncompetition and nonsolicitation agreement stated as follows:

> "1. <u>Non-competition</u>. During the term of Employee's employment by Employer and continuing for a period of two (2) years following the date on which such employment relationship is terminated, Employee shall not, directly or indirectly, in any capacity, including as an employee, consultant, partner, shareholder, officer or director of any entity engage or participate in any Competitive Business; provided, however, that Employee may own, directly or indirectly, solely as an investment, securities of any entity traded on any national securities exchange if Employee does not control, and is not a member of a group which controls, such entity. For purposes of this Agreement, '<u>Competitive Business</u>' shall mean providing mental health treatment services to individuals, children, couples[,] or families within a fifty (50) mile radius of Employer's principal place of business in Champaign, Illinois.

> 2. <u>Non-solicitation of Employees</u>. During the term of Employee's employment by Employer and continuing for a period of two (2) years following the date on which such employment relationship is terminated, Employee shall not, directly or indirectly, hire or solicit, or cause others to hire or solicit, for employment or consulting services, or cause or encourage to leave the employ of Employer, any employee of Employer, or any person who was an employee of Employer at any time within the six (6) month period immediately prior to the termination of Employee's employment relationship.

3. <u>Non-solicitation of Patients</u>. During the term of Employee's employment by Employer and continuing for a period of two (2) years following the date of which such employment relationship is terminated, Employee shall not, directly or indirectly, solicit for Employee's own benefit, or for the benefit of any third party, any patient, customer, supplier, or other business relation of the Employer, or request or advise any such party to curtail or cancel its business relationship with the Employer.

4. <u>Specific Performance</u>. The parties hereto acknowledge that the interests intended to be protected by the restrictive covenants set forth in this Agreement represent legitimate, valuable business interests of Employer and that any breach of these covenants by Employee would result in irreparable damage to Employer for which money damages would not be an adequate remedy. Accordingly, in the event of a breach by Employee of any restrictive covenant set forth in this Agreement, Employer shall be entitled to seek injunctive relief including but not limited to an order of specific performance, from a court of competent jurisdiction.

5. <u>Severability</u>. If all or part of this Agreement is declared to be unlawful or invalid, such unlawfulness or invalidity shall not serve to invalidate any portion of this Agreement not declared to be unlawful or invalid. Any provision so declared to be unlawful or invalid shall, if possible, be construed in a manner that will give effect to the terms of such provision to the fullest extent possible while remaining lawful and valid."

The remainder of the agreement (1) required any amendment or modification to be in writing signed by both parties, (2) addressed waiver and severability, (3) stated the agreement, together with the employment agreement, represented the entire agreement, and (4) provided for the applicable law and venue for any dispute related to the agreement.

3

¶ 5    Jenkins provided notice of his planned departure to TRCG on July 6, 2022. His resignation from TRCG was effective August 5, 2022.

¶ 6    On October 20, 2022, TRCG filed a three-count verified complaint against Jenkins alleging that Jenkins incorporated a new business, Never Forgotten Service, PLLC, in February 2022, prior to his resignation from TRCG. The pleading further alleged that Jenkins's new business targeted therapy and services for military and first responders in Mahomet, Illinois, which was two miles from a TFCG secondary location also located in Mahomet, Illinois. The complaint alleged that Jenkins hired, or solicited to hire, an individual with whom he previously worked at TRCG, and also solicited TRCG patients. The three counts requested respectively, a finding of breach of contract, a temporary restraining order (TRO), and a preliminary injunction enforcing the noncompetition and nonsolicitation agreement. An affidavit attached to the complaint certified that money damages were expected to exceed $50,000. A copy of the noncompetition and nonsolicitation agreement was also attached.

¶ 7    The hearing on the motion for TRO was held the following day on October 21, 2022. TRCG appeared by counsel. Jenkins appeared without counsel. Following arguments, the circuit court weighed the factors noting that it should deny injunctive relief where it would "cause serious harm to the public without corresponding great advantage" to the movant and that factor gave "the most concern in this case" due to the "nature of the business involved." The court acknowledged that it was unaware of Jenkin's scheduled appointments over the next 10 days but had "a concern that [Jenkins] has a client who's in a crisis situation scheduled to come in on Monday" and "his patient shows up Monday to find the doors locked and that patient is homicidal or suicidal that's a huge damage to the public." The circuit court was also "concerned about enforcing a 50-mile radius of any type of practice." Therefore, the circuit court entered a TRO enjoining Jenkins from violating

4

the agreement's nonsolicitation provisions but denied TRCG's request for injunctive relief related to the noncompete clause that would enjoin Jenkins from providing mental health treatment services to individuals, couples, or families within a 50-mile radius of Champaign, Illinois. The TRO was to remain in effect for 10 days.

¶ 8    On October 26, 2022, Jenkins obtained legal counsel and TRCG filed a memorandum of law in support of its motion for preliminary injunction stating it was likely to succeed in enforcing the agreement, it had no adequate remedy at law, and would suffer irreparable harm without the injunctive relief. Attached to the TRCG memorandum of law were affidavits from Philip Pence and Robert "RJ" McNicholl.

¶ 9    Pence's affidavit revealed that he was the attorney for TRCG and sent correspondence to Jenkins on August 31, 2022, notifying Jenkins of his violations of the noncompetition and nonsolicitation agreement and demanding Jenkins cease and desist. Pence further stated that he sent "a letter of final notice to cease and desist with violations to the Agreement" to Jenkins on October 7, 2022. The remainder of the affidavit revealed communications between Pence and Jenkins, with the latest on October 20, 2022. On that date, Pence stated that Jenkins told him that he did not intend to comply with the noncompetition and nonsolicitation agreement.

¶ 10    McNicholl's affidavit revealed that he was co-owner, manager, and senior therapist of TRCG. The affidavit confirmed Jenkins's employment from March 2019 to August 2022 and stated that since opening the business in 2009, and "expanding to open an office in Mahomet, Illinois in 2019, TRCG has worked hard and significantly invested to grow its brand, reputation, and client base." McNicholl stated TRCG's primary business territory was in Champaign, Illinois, including Mahomet, and its primary business objective was to grow business in that area, which involved "investing significant time and money into marketing our business and building

5

relationships" during the 10 years TRCG had been providing mental health services. McNicholl stated, "This targeted growth has also included specialized services for military veterans and first responders, including" at the Mahomet location and that providing therapy services, particularly to those groups in that area, was competitive, listing one other therapy group in the Mahomet area that provided specialized services for military veterans and first responders. McNicholl stated, "Being unable to see a specific therapist in a specific town will not harm the veteran or first responder community" specifically in Mahomet, because "TRCG and its existing competitors in Mahomet provide these services locally," telehealth visits were an option, and first responders had access through an employee assistance program that ensured access to mental health services. The remainder of the McNicholl's affidavit addressed the length of time to hire, credential, and train new therapists as well as the amount of compensation Jenkins received as a TRCG employee, until his voluntary resignation. The affidavit also stated that many teletherapy services could remotely provide mental health services to patients outside their geographic location.

¶ 11   On October 27, 2022, the circuit court granted Jenkins's counsel until October 31, 2022, to file a response and set the preliminary injunction hearing on October 31, 2022. Jenkins's counsel filed an unverified memorandum of law claiming that TRCG employed 18 therapists and during Jenkins's employment with TRCG he focused on providing therapy services to veterans and first responders. Jenkins was a veteran, which allowed him to relate to the traumas presented by the clients. He was assigned the majority of these clients at TRCG and created confidential, safe, trusting relationships with his clients. Some of his prior clients decided to continue their therapy with Jenkins and followed him to his new practice, where he was a sole practitioner providing therapy services to veterans and first responders. The remainder of the pleading provided a legal argument related to the issuance of a preliminary injunction.

¶ 12    The matter proceeded to a hearing on October 31, 2022. TRCG advised the court they were "here today, most squarely right now on the point of competition." TRCG admitted that it did "not have any evidence to prove that solicitation occurred"; however, the letter advising of Jenkins's resignation from TRCG raised a serious question of how "these clients know that he is out there practicing right now if he is not directly or indirectly soliciting clients to come to see him at his new business." The heart of the issue for TRCG was "competition." After stating that Jenkins conceded the 50-mile radius was reasonable, the court stopped the argument and questioned counsel about that statement. While TRCG's counsel tried to respond, Jenkins's counsel stated, "We conceded that it was tailored to allow [TRCG] to practice in Champaign area, not that it was reasonable." TRCG's counsel then stated, "That's correct, your Honor. And so[,] they had conceded that the 50-mile scope is tailored to the Champaign-Urbana area, and case law submitted in TRCG's memorandum supports that is a reasonable geographic scope under Illinois law." TRCG's counsel clarified that Jenkins was not prohibited from practicing anywhere in the state, he was only prohibited "in the area where his previous employer has set up shop and decided they are going to market themselves." Counsel stated that Jenkins was "attempting to take a market share away from [TRCG] ***. *** What matters is that he has set up shop just down the street from [TRCG], something that he agreed not to do under the agreement."

¶ 13    TRCG's counsel further argued that no harm to the public would occur if Jenkins was enjoined and that case law supported this position because *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52 (2006), stated the issue was not whether the patients should be allowed to see their chosen physician, the question was "would enforcing the agreement significantly diminish the amount of cardiologists in the area?" The supreme court found that answer was "no" and allowed enforcement of the agreement. Counsel argued that the same is seen in the case at bar. TRCG, as

7

well as another company called Grace and Grit, provided services for veterans and first responders in the Mahomet, Illinois, area and therefore, the public would not be harmed if Jenkins were not allowed to open a business in the same area. Further, if Jenkins wanted to continue to directly provide services to his clients, he could practice outside the 50-mile scope and continue to see those patients via telehealth. It would just be a matter of inconvenience to Jenkins. TRCG argued that the issue was market share, and those damages were more difficult to prove which was why irreparable harm would come to TRCG if Jenkins was allowed to continue with his current practice.

¶ 14    Jenkins's counsel argued that TRCG could not prove irreparable harm or an inadequate remedy at law. As TRCG counsel stated, there was no way to prove how much of the market share Jenkins was taking, especially since he was just one practitioner as opposed to 18 practitioners at TRCG. The court disagreed stating the noncompete was not limited to a large corporation, it was a complete noncompete. Jenkins argued in the alternative that money damages, *i.e.*, the cost of each session with a prior client, was calculable. Further, the covenant could only be enforced if it were reasonable and necessary. Jenkins was practicing in a small area involving veterans and first responders as compared with TRCG's full practice including children, adolescents, couples, and families. Jenkins's counsel further argued that the National Association of Social Workers (NASW) provided clients with a right to choose their therapists.

¶ 15    The court asked about the reasonableness of the 50-mile limitation. Jenkins's counsel agreed it was 50 miles from the Champaign, Illinois, TRCG location. TRCG's counsel confirmed the address of the building location and stated the only other major town that would be included would be Danville, specifically stating that Mattoon, Effingham, Springfield, Decatur, Bloomington, Peoria, and Kankakee would all be outside the 50 miles, so the geographic

8

limitations were "essentially the Champaign-Urbana area." TRCG's counsel stated Jenkins could see patients in Bloomington who were residents of the area included within the 50-mile scope.

¶ 16 The court also inquired as to the importance of the therapist/patient relationship which was built over time given its difference from the usual doctor/patient relationship and the rigid application of noncompetition agreements for two years and 50 miles, even carving out the exception for telehealth, which some people might not be comfortable with. TRCG replied that it was a serious issue but if the patients were so committed to Jenkins and vice versa, options existed. However, in this case, Jenkins was not terminated; instead, Jenkins resigned and started his own business in direct competition with his prior employer. Those clients could return to TRCG, and if they did not want to do that, they could go to Grace and Grit or call a 1-800 number provided for first responders through their Employee Assistance Program and be linked to a therapist. Following further inquiry by the court, Jenkins's counsel confirmed that the noncompetition clause also extended to the hypothetical presented by the court in which Jenkins went to work at a different group and had no ownership share. Following the argument, the court took the matter under advisement.

¶ 17 On November 1, 2023, the circuit court issued a preliminary injunction order that found TRCG possessed a clearly ascertainable right in need of protection as TRCG possessed a valid contract with a former employee that enjoined him "from poaching other staff, clients, or competing in the counseling business within 50 miles of Champaign-Urbana." The circuit court found there was a fair question of success based on the verified complaint, the valid noncompetition and nonsolicitation agreements, and Jenkins's conduct that violated the contractual terms. The circuit court considered the issue of irreparable harm and adequate remedy at law and found the contractual language itself was sufficient to find irreparable harm and

inadequate remedy at law. However, citing *Scheffel Financial Services, Inc. v. Heil*, 2014 IL App (5th) 130600, ¶ 24, it further found, even without the clause, Illinois courts recognized an erosion of client base and profit on an ongoing basis constituted significant injury for which money damages may be inadequate. The court noted that the "hallmark of inadequate remedy at law in the context of a non-competition or non-solicitation agreement" was that the "transgressions (in this case: Jenkins operating a competing business in the same community in the same field) are of a continuous and ongoing nature." The court balanced the equities and found Jenkins's business competing within a 50-mile radius "will cause ongoing and increasing financial harm in the form of lost profits" to TRCG. As to Jenkins, the court stated, "Jenkins is still able to live in Champaign-Urbana and practice in nearby metropolitan areas, and he is still able to see patients in the Champaign-Urbana area by telehealth" and found the equities favored granting the injunction to TRCG.

¶ 18    The court also addressed the "vital interest to a community" of mental health counseling and stated, "the non-solicitation did not greatly burden the public and presents an easy decision to the court." The court continued:

> "The two-year non-competition covenant within 50 miles of Champaign-Urbana is a more difficult consideration. Jenkins made several public policy arguments during the preliminary injunction hearing. Certainly, enforcement of the agreement is bad for Jenkins, but it is also bad for Jenkins's clients who presumably come to him because they connect with him in an important way. The court also considers the impact on the public, which will lose in-person access to an experienced mental health and counseling practitioner for a two-year period. Although that harm to the public is nontrivial, the court is mindful that there is not a monopoly for counseling services in the area, and that if counseling

10

organizations cannot protect their business interest adequately, there will be fewer of them. The case of *Prairie Eye Ctr. v. Butler*, 329 Ill. App. 3d 293, 300 (2002), makes clear that noncompetition agreements in the medical arts are enforceable if they are sufficiently restricted in location and duration. A two-year term with a reasonable geographic restriction and that allows for the possibility of telehealth counseling of patients within the Champaign-Urbana area is not so injurious to the public that it cannot be enforced."

¶ 19   Thereafter, the court enjoined Jenkins from (1) engaging in a "Competitive Business" providing mental health treatment services to individuals, children, couples, or families within a 50-mile radius of TRCG's principal place of business in Champaign, Illinois, and (2) violating the provisions of the noncompetition and nonsolicitation agreement regarding employees and patients of TRCG. Jenkins timely appealed.

¶ 20                                    II. ANALYSIS

¶ 21   On appeal, Jenkins argues that the circuit court erred by granting the preliminary injunction, arguing that the restrictive covenant was unenforceable. "The purpose of preliminary injunctive relief is not to determine controverted rights or decide the merits of the case, but to prevent a threatened wrong or continuing injury and preserve the status quo with the least injury to the parties concerned." *Hutsonville Community Unit School District No. 1 v. Illinois High School Ass'n*, 2021 IL App (5th) 210308, ¶ 11. For entitlement to injunctive relief, movants must demonstrate that they (1) possess a protectable right, (2) will suffer irreparable harm without the protection of an injunction, (3) have no adequate remedy at law, and (4) are likely to be successful on the merits. *Mohanty*, 225 Ill. 2d at 62.

¶ 22   " 'On appeal, we examine only whether the party seeking the injunction has demonstrated a *prima facie* case that there is a fair question concerning the existence of the claimed rights.' " *Id.*

11

(quoting *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 177 (2002)). Typically, a circuit court's injunctive order is reviewed for an abuse of discretion. *Id*. at 62-63. "However, whether injunctive relief should issue to enforce a restrictive covenant not to compete in an employment contract depends upon the validity of the covenant, the determination of which is a question of law." *Id*. at 63.

¶ 23    "[A] restrictive covenant will be upheld if it contains a reasonable restraint and the agreement is supported by consideration." *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 16. Here, there is no dispute that the agreement was supported by consideration. Accordingly, our review is limited to whether the covenant contains a reasonable restraint. On appeal, Jenkins's arguments were limited to the validity of a restrictive covenant for persons providing mental health therapy and, assuming they were valid, the temporal and geographic restrictions imposed in the TRCG contract.

¶ 24    Jenkins first contends that granting the injunction is contrary to the National Association of Social Workers' Ethical Rules which limit withdrawal of treatment by the provider and also limit telehealth therapy to that of the patient's "choice" and requires informed consent. Citing the First Responder Mental Health Grant Program Act (405 ILCS 135/1 *et seq*. (West 2022)), Jenkins also argues that enforcement violates public policy, claiming that mental health for first responders is a serious concern in need of protection.

¶ 25    We note that this state has long held that private contracts "will not be declared void as contrary to public policy unless it is 'clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be public policy' or it is clearly shown that the contract is 'manifestly injurious to the public welfare.' " (Internal quotation marks omitted.) *Mohanty*, 225

Ill. 2d at 65 (quoting *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 300 (2006)). With these principles in hand, we consider Jenkins's arguments.

¶ 26    We find Jenkins's reliance on the National Association of Social Workers' Ethical Rules misplaced. In determining whether a restrictive covenant concerning cardiologists violated public policy, the supreme court determined the policies of the AMA Council on Ethical and Judicial Affairs was "not the equivalent of an Illinois statute or rule of professional conduct" and did "not provide a clear expression of the public policy of this state." *Id.* at 67 ("while informative, [AMA Opinion 9.02] is not the equivalent of an Illinois statute or rule of professional conduct and, for that reason, does not provide a clear expression of the public policy of this state"). We find the same regarding the National Association of Social Workers' Ethical Rules.

¶ 27    Jenkins's reliance on the First Responder Mental Health Grant Program Act (405 ILCS 135/1 *et seq.* (West 2022)) is only moderately more persuasive. The legislative intent, found therein, states, "It is the intent of the General Assembly to ensure that first responders, including police, firefighters, emergency medical technicians, and public safety telecommunicators across this State have full access to supportive and responsive behavioral health services and treatment." *Id.* § 5(b). The remainder of the section acknowledged and recognized the difficult nature of the first responder's job and the trauma endured therein, as well as the necessity that services be responsive to the individual's needs, be confidential, and reduce the "historical barrier of stigma" associated with requesting treatment. *Id.* §§ 5(a), (c), (d). While the Act addresses a need for such services similar to those provided by Jenkins, nothing in the Act prohibits the enforcement of a restrictive covenant for therapy providers. Further, the statutory language allows for behavioral health care services via "telehealth services." *Id.* § 15(c).

13

¶ 28    At oral argument, both parties were asked about the June 10, 2022, enactment of the Ensuring a More Qualified, Competent, and Diverse Community Behavioral Health Workforce Act (405 ILCS 145/1-1 *et seq.* (West 2022)). Neither party was aware of the Act, and each was granted the opportunity to brief the Act following oral argument. In that Act, the legislature specifically found that "[t]he behavioral health workforce shortage, already at dire levels before 2020, has been exacerbated by the COVID-19 pandemic and is at a crisis point." *Id.* § 1-5(1). Additional findings by the legislature include projections that "[b]y 2026, unfilled mental healthcare jobs in Illinois are expected to reach 8,353, according to Mercer's 2021 External Healthcare Labor Market Analysis." *Id.* § 1-5(3). The Act provides eligible entities receiving grants under the Act "funds *** to establish new, or enhance existing, training, and supervision of interns and behavioral health providers-in-training pursuing licensure as a licensed clinical social worker," among other professions. *Id.* § 1-15. The priority in awarding grants is for "underserved urban areas and rural areas of the State." *Id.* § 1-20.

¶ 29    Jenkins's post-oral argument brief addressed the behavioral health workforce shortage and cited the "dire levels before 2020" which were "exacerbated by the COVID-19 pandemic and is at a crisis point." *Id.* § 1-5(1). Jenkins argued that the legislative findings state public policy regarding these fields, which distinguishes this case from that of *Mohanty*. He further argues that allowing an injunction for the noncompete clause "flies in the face of the General Assembly's stated goal of ensuring the growth and development of a qualified, competent, and diverse community of behavioral health workers" and would "unduly harm the public."

¶ 30    In response, TRCG notes that the Act states "[t]he behavioral health workforce shortage *** is at a crisis point" but argues that the Act's public policy considerations are not at issue in this case because "there is no evidence to show the Act was intended to intervene in the freedom

14

to contract between a private entity and its at-will employees." TRCG states it is inappropriate for this court to look beyond the evidence presented at the injunction hearing and it is speculative for this court to consider the public policy noted in the Act when the evidence submitted at the hearing revealed no shortage of behavioral health workers in Mahomet, the same town where Jenkins started his competing business. TRCG further argues that the Act supports the injunction by recognizing the length of time it takes to credential a licensed social worker and it would burden private entities if their training of new clinicians could not be protected by a noncompete agreement. TRCG urged this court to look to the current standard, as opposed to creating new law, because if the Act intended to eliminate restrictive covenants between private entities it could have but did not. TRCG urged this court to follow *Mohanty* which recognized the benefit of enforcing private contracts unless enforcing the restrictive covenant would "seriously diminish" the availability of those professionals to provide necessary patient care. TRCG argued that no such finding could be made here because the evidence revealed that other clinicians were available in the area to provide mental health treatment.

¶ 31    TRCG's arguments are compelling. However, the shortage of behavioral treatment providers is not limited to community-based agencies. The Act is consistent with government data revealing the shortage of mental health workers across the United States as well as in Illinois based on Health Resources & Services Administration (HRSA) data as of November 2022.[1] Based on

---

[1]See https://www.ruralhealthinfo.org/charts/7 and https://ruralhealthinfor.org/charts/7?state=IL. "This court may take judicial notice of readily verifiable facts if doing so will aid in the efficient disposition of a case, even if judicial notice was not sought in the trial court." (Internal quotation marks omitted.) *Kramer v. Ruiz*, 2021 IL App (5th) 200026, ¶ 32 n.3. "The ability of an appellate court to 'take judicial notice of information on a public website even though the information was not in the record on appeal' has also been recognized by Illinois courts." *Id*. (quoting *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 118 n.9); *Aurora Loan Services, LLC v. Kmiecik*, 2013 IL App (1st) 121700, ¶ 37 (quoting *Department of Human Services v. Porter*, 396 Ill. App. 3d 701, 725 (2009)); see also *People v. Davis*, 65 Ill. 2d 157, 164-65 (1976) (the Illinois Supreme Court held, "In our judgment, the extension of the doctrine of judicial notice to include facts which, while not generally known, are readily verifiable from sources of indisputable

15

that data, only three Illinois counties (Boone, Lake, and Kendall Counties) had no shortage of mental health workers. An additional five Illinois counties (Whiteside, Kane, Cook, Du Page, and Will Counties) were classified as having only a part of the county as a shortage area. Conversely, all of the remaining Illinois counties were classified as "whole county is a shortage area." This latter group included Champaign County, where TRCG is located, as well as every surrounding county thereto.

¶ 32    Private contracts are void as contrary to public policy when they are " 'clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy' " or where it is shown they are " 'manifestly injurious to the public welfare.' " *Vine Street Clinic*, 222 Ill. 2d at 300 (quoting *Schumann-Heink v. Folsom*, 328 Ill. 321, 330 (1927)). Here, the Illinois legislature has clearly indicated the lack of behavioral health workforce moved from "dire levels before 2020" and now "is at a crisis point." 405 ILCS 145/1-5(1) (West 2022). However, as correctly noted by TRCG, the Act did not oust or even discourage noncompetition clauses for licensed clinical social workers in either the private or public sector. Therefore, we do not find the Act supports a conclusion that every noncompetition clause for behavioral healthcare workers violates public policy.

¶ 33    As such, we limit the remainder of our review to addressing whether the restraint contained in the noncompete clause is reasonable. This requires consideration of whether enforcement will (1) be injurious to the public, (2) cause undue hardship to the promisor, and (3) result in an imposed restraint greater than necessary to protect the promisee. *Mohanty*, 225 Ill. 2d at 76. Reasonableness "depends on the unique facts and circumstances of each case" and is not "determined in the

---

accuracy is an important aid in the efficient disposition of litigation, and its use, where appropriate, is to be commended.").

abstract." *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc*., 378 Ill. App. 3d 437, 447 (2007).

¶ 34 As to whether enforcement would be injurious to the public, TRCG submitted an affidavit stating the public would not be harmed by enforcement of the restrictive covenant because there was at least one other business providing mental health treatment to first responders and veterans in the area. However, no evidence was submitted as to the number of first responders or veterans in need of treatment in either Mahomet or Champaign, Illinois. Further, no evidence was submitted regarding the sufficiency of licensed clinical social workers or the number of first responders or veterans in need of treatment for any of the surrounding counties encompassed by the 50-mile radius. Conversely, the deficiency of behavioral healthcare workers was found to be at a "crisis point" according to the Illinois legislature and every county at issue in this case was listed as having a shortage of mental health workers by the HRSA. For these reasons, we find that TRCG failed to submit sufficient evidence showing that its noncompetition language would not be injurious to the public.

¶ 35 Regarding whether enforcement would cause undue hardship to Jenkins, the sole evidence submitted by Jenkins was his statement at the initial TRO hearing. At that time, he stated, "Sir, my only request is this is my livelihood at this time. In terms of fairness, The Rock is a large practice, multiple therapists, multiple sources of income. It's just me for my family." Equally relevant, however, TRCG's evidence showing that Jenkins's potential undue hardship was brought about by his own actions. As such, we find sufficient evidence was submitted rebutting Jenkins's claim of undue hardship to allow for enforcement of the noncompetition agreement.

¶ 36 Finally, we consider whether the restraint imposed is greater than necessary to protect the promisee. Here, TRCG submitted the sworn statement of RJ McNicholl. It is within this affidavit

17

that Mr. McNicholl averred that there was at least one other therapy group in Mahomet providing treatment for first responders and veterans. However, as noted above, no information was provided regarding Champaign, Illinois, Champaign County, or any of the surrounding counties included in the 50-mile radius. Further, the affidavit did not indicate that it provided services to any residents in the 50-mile radius at a location other than the facilities in Champaign or Mahomet. Based on this evidence, TRCG argued that the "50-mile restriction [was] specifically tailored to allow TRCG to compete and build its brand within the Champaign-Urbana metro area." TRCG further claimed that Decatur, Bloomington, and Mattoon were not within the scope of the radius. We disagree.

¶ 37    The restrictive covenant prohibits Jenkins from working as a licensed clinical social worker for two years within a 50-mile radius of TRCG's primary office in Champaign, Illinois. While arguments were presented that such area only precluded working in the larger cities of Champaign and Danville, Illinois, such arguments are undermined by geographic maps revealing the breadth of the 50-mile radius from TRCG's principal office. The prohibited areas include Decatur, Bloomington, Normal, Urbana, Danville, Charleston, Mattoon, and Rantoul, Illinois. The area covers parts, if not all, of over 14 counties, including Champaign, Vermilion, Edgar, Clark, Coles, Douglas, Moultrie, Macon, Piatt, De Witt, McLean, Ford, Livingston, and Iroquois Counties, as well as parts of three counties in Indiana, including Warren, Vermillion, and Fountain Counties. Even if we found that Champaign County was not underserved by the evidence submitted before the circuit court, there was no evidence submitted regarding these other counties.

¶ 38    Nothing in the Ensuring a More Qualified, Competent, and Diverse Community Behavioral Health Workforce Act prohibits enforcement of restrictive covenants for behavioral workers, including those in Jenkins's licensed clinical social worker profession. However, enforcement of TRCG's restrictive covenant in determining whether the restraint imposed is greater than

necessary to protect TRCG must be considered in conjunction with a clearly recognized shortage of behavioral workers by our legislature as well as the government data revealing the extent of a shortage encompassing every county affected by the noncompetition clause.

¶ 39    Even without the legislative findings, there are grave concerns enforcing a restrictive covenant with a span encompassing such a large area. The majority of cases upholding a restrictive covenant have been for smaller areas. See *Mohanty*, 225 Ill. 2d at 77 (prohibited  area consisted of two- and five-mile restrictions from prior employment); *Canfield v. Spear*, 44 Ill. 2d 49 (1969) (restriction from practicing within 25-mile radius of Rockford, Illinois); *Bauer v. Sawyer*, 8 Ill. 2d 351, 354 (1956) (25-mile radius of Kankakee); *Ryan v. Hamilton*, 205 Ill. 191, 192 (1903) (8 miles in or around Viola, Illinois); *Prairie Rheumatology Associates, S.C. v. Francis*, 2014 IL App (3d) 140338, ¶ 3 (14-mile radius of corporate office). When the 50-mile radius is contemplated in conjunction with the legislative findings clearly establishing a shortage of behavioral health workers in professions such as Jenkins's, it is difficult to find the restraint imposed is not greater than necessary to protect TRCG. This is especially true when every county included in the prohibited area was listed as a "whole county is a shortage area" for mental health workers.

¶ 40    As to the duration of the restriction, Mr. McNicholl averred that hiring, credentialing, and training new therapists took two years and even when hiring experienced therapists, it took a year for that therapist to have an operational practice and a full list of patients. This evidence was undisputed. However, there was no evidence submitted indicating that TRCG operated at a monetary loss when they employed either a new or experienced clinician. While Jenkins's salary was provided, there was no evidence as to the amount of revenue TRCG received from Jenkins's employment during the years that Jenkins was obtaining his clinical license. Therefore, while the

19

evidence provides a rationale for the duration, no evidence was submitted showing the two-year restraint was not greater than necessary to protect the TRCG.

¶ 41 Here, we find both the geographical and temporal restraints unreasonable because they are greater than necessary to protect TRCG. We further find the geographical restraint would be injurious to the public, as our legislature has clearly established that Illinois has a shortage of behavioral health workers, which includes licensed clinical social workers such as Jenkins. Enforcement of the restrictive covenant would "seriously diminish" the available behavioral health workers in both Champaign County, as well as each of the surrounding counties, all of which have a shortage of these professionals at this time.

¶ 42 The issue before this court is whether the trial court's granting of the preliminary injunction was proper. Whether injunctive relief should be issued to enforce a restrictive covenant not to compete in an employment contract depends upon the validity of the covenant, the determination of which is a question of law. *Mohanty*, 225 Ill. 2d at 63. Here, TRCG produced insufficient evidence that enforcement would not be injurious to the public and insufficient evidence that the geographic scope and duration restraints imposed were not greater than necessary to protect TRCG. Accordingly, we vacate paragraph 1 of the circuit court's preliminary injunction order regarding the noncompete clause. As no argument regarding the order's remaining paragraphs addressing solicitation was presented, those paragraphs are affirmed.

¶ 43                                   III. CONCLUSION

¶ 44 For the foregoing reasons, we vacate the circuit court's preliminary injunction order enjoining Jenkins from engaging in "Competitive Business" providing mental health treatment services to individuals, children, couples, or families within a 50-mile radius of TRCG's principal place of business in Champaign, Illinois, and affirm the remaining prohibitions contained therein.

20

¶ 45    Affirmed in part and vacated in part.